Gina LOWE, Plaintiff–Appellant,

v.

SPORICIDIN INTERNATIONAL, Defendant–Appellee.

No. 94–1821.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 2, 1994.

Decided Feb. 15, 1995.

---

**ARGUED:** Paul Steven Blumenthal, Paul S. Blumenthal & Associates, Davidsonville, MD, for appellant.  Lawrence Steven Ebner, McKenna & Cuneo, Washington, DC, for appellee.

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge MOTZ wrote the opinion, in which Judge MURNAGHAN and Judge NIEMEYER joined.

## OPINION

MOTZ, Circuit Judge:

In this diversity case a plaintiff, who has alleged she was injured after using defendant's disinfectant, appeals from the district court's order granting defendant's motion for summary judgment. The district court held plaintiff's claims were preempted by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) or were supported by "insufficient evidence" to create a genuine issue of material fact precluding summary judgment. We affirm, although for reasons somewhat different than those of the district court.

### I.

Gina Lowe alleged that she was injured through the use of Sporicidin Cold Sterilizing Solution (CSS), a product manufactured by Sporicidin International.[1] Lowe is a citizen of the District of Columbia; Sporicidin is a Maryland corporation with its principal place of business in Rockville, Maryland. Lowe inhaled fumes from CSS, a glutaraldehyde based cold sterilizing solution, which assertedly caused Lowe to develop asthma and other respiratory disorders. Lowe used CSS to sterilize hospital instruments as part of her duties as a hospital technician. At the time that Lowe used CSS, it was a pesticide registered with the EPA as required by FIFRA, 7 U.S.C. §§ 136–136y, and so bore an EPA-approved label.

When registering a pesticide with the EPA, an applicant must submit, *inter alia*, "a complete copy of the labeling of the pesticide, a statement of all claims made for it and any directions for its use." 7 U.S.C. § 136a(c)(1)(C). The Administrator of the EPA will register the pesticide if he determines, *inter alia*, "its labeling and other material require[d] to be submitted comply with" FIFRA's requirements. 7 U.S.C. § 136a(c)(5)(B). The record reveals that, when Sporicidin applied for registration of CSS, the EPA informed the company that Sporicidin was "required" to "delete[ ] from the label" the claim that " 'when diluted for disinfection (1:16), Sporicidin is hypoallergenic (non-sensitizing).' " The EPA stated, "[w]ith respect to the issue of hypoallergenic claims, EPA has no data or approval from FDA regarding such a claim. Moreover, EPA would not allow the claim anyway because it is considered a safety claim that is violative of the regulations set forth at 40 C.F.R. § 162.10(a)(5)(ix)." In addition, the EPA stated that the phrase " 'no gloves required' . . . should be deleted" from the label. The EPA also stated, "Your new proposed statement: 'Solutions more concentrated than 1:16 may sensitize and may cause skin irritation' is acceptable so long as you do not use it in conjunction with statements such as 'nonirritating', 'nonsensitizing', 'non-hypoallergenic', etc. at 1:16."

Consistent with these directives, Sporicidin's 1989 EPA-approved label for CSS contained the following "PRECAUTIONARY STATEMENTS":

Avoid skin contact. Solution more concentrated than 1:16 may sensitize and may cause skin irritation. Flush thoroughly with water after contact. 

Avoid eye contact. Causes eye irritation. In case of contact flush with water immediately, and get medical attention. . . .

Use in ventilated areas. . . .

This label and the CSS 1987 label, which contained similar warnings,[2] were the only documents in the record for which Sporicidin received EPA approval.

The record reveals, however, that some 1987 to 1989 advertisements for CSS stated, "Sporicidin is a 'tamed' glutaraldehyde that does not yellow or irritate skin or mucous

---

1. The product is referred to in the advertisements as "Sporicidin." To avoid any confusion between the company and the product, the product will be referred to herein as "CSS."

2. The 1987 label did not contain the warning "Use in ventilated areas."

membranes." Another advertisement stated, under the heading "Human Safety," "Sporicidin has been used in our facility for more than two years ... our staff prefers Sporicidin because it does not irritate the eyes or nasal passages." Yet another advertisement stated, " 'There was no indication of skin irritation or toxicity.' " Still other advertisements stated, "[n]o gloves are necessary for safety."

Lowe filed a skeletal complaint alleging claims for negligent design, manufacture, marketing, distribution, and sale of CSS, negligent failure to warn, breach of implied warranties, breach of express warranties, and strict liability. Lowe's subsequent pleadings and argument before the district court establish that the principal basis for her claims—except for that based on an implied warranty of merchantability—was not that the EPA-approved label for CSS was misleading, inadequate, or otherwise unlawful, but that Sporicidin's advertisements, which were assertedly contrary to the EPA-approved label, were. As her counsel stated at oral argument before the district court, "we don't have any allegations that Ms. Lowe was put off by the label, but by the promotional material [advertisements] and express representations by the defendants...." Thus the district court correctly recognized that Lowe's chief claim was "not failure to warn per se." Rather, what she asserted was that Sporicidin in its advertisements made "statement[s] that [are] allegedly inconsistent with ... the warning that has been approved." The district court found that all claims based on such a theory were preempted by FIFRA and that any remaining claims were supported by "insufficient evidence" to create a genuine dispute of material fact precluding summary judgment.

## II.

In considering whether Lowe's claims are preempted by FIFRA, we "express no opinion on whether [they] are viable claims as a matter of state law; we assume *arguendo* that they are." *Cipollone v. Liggett Group, Inc.*, — U.S. —, —, 112 S.Ct. 2608, 2621, 120 L.Ed.2d 407 (1992). The parties focus their preemption arguments solely on the question of whether *Worm v. American Cyanamid Co.*, 970 F.2d 1301 (4th Cir.1992) (*Worm I*), and *Worm v. American Cyanamid Co.*, 5 F.3d 744 (4th Cir.1993) (*Worm II*), require preemption here. These precedents, to be sure, are important to our consideration of preemption in this case. But of equal importance are portions of FIFRA that were not involved in, or pertinent to, the *Worm* decisions.

As we explained in *Worm I*,

FIFRA, enacted originally in 1947 as a pesticide licensing and labeling statute .... was amended in 1972 .... [t]he amendments, which were prompted by safety and environmental concerns, as well as a "growing perception that the existing legislation was not equal to [its] task" transformed FIFRA into "a comprehensive regulatory statute," regulating the labeling, sale, and use of pesticides both in intrastate and interstate commerce.

*Worm I*, 970 F.2d at 1305. In *Worm II*, we described FIFRA's "involved process of review by the EPA, culminating in approval of the label under which a product may be marketed." *Worm II*, 5 F.3d at 747. As part of this review process, FIFRA requires an applicant to furnish "a statement of all claims to be made" for the pesticide, 7 U.S.C. § 136a(c)(1)(C), and then expressly prohibits anyone, when selling the pesticide, from making any claims for it that "substantially differ" from the claims made for the product at the time of registration. 7 U.S.C. § 136j(a)(1)(B). Neither of these statutory sections was at issue in the *Worm* decisions. There was no argument in those cases that the company had issued any advertisements or other "claims" that "substantially differ[ed]" from its labeling.

Rather, the argument in the *Worm* cases was that the company should have issued warnings *in addition to* those contained in its labeling. We held that such claims were preempted by FIFRA, specifically by 7 U.S.C. § 136v(b). Section 136v explains the authority the states retain under FIFRA to regulate pesticides and the authority preempted by federal law. It provides that "(a) ... [a] state may regulate the sale or use of any federally registered pesticide or

device in the State," but "(b) . . . such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter."

In *Worm I*, we held, "to the extent that Maryland law imposes a duty to provide a warning 'in addition to or different from' federal pesticide labeling standards, it is preempted by *conflicting* with federal law." *Worm I*, 970 F.2d at 1303. However, we also noted, "[a]pplying traditional principles of preemption we conclude that Congress did not expressly, or by implication, preempt *the field* of pesticide regulation or a more narrowly defined field," *id.*, and that although the definition of labeling "is quite broad, it would not appear to include general advertising statements not made in connection with a particular sale." *Id.* at 1307 n. 2. We explained:

> [A]t oral argument counsel for the Worms observed correctly that if the Maryland common law recognizes *a tort based on breach of a federally imposed standard,* the Worms would be able to pursue that claim without conflicting with federal law.
>
> We find support for our strict standard in determining whether a conflict exists in the recognition that FIFRA does not explicitly create a federal right of action to compensate persons who may be injured by misleadingly labeled pesticides. For "[i]t is difficult to believe that Congress would without comment, remove all means of judicial recourse for those injured by illegal conduct."

*Id.* at 1308. (emphasis added). Because the district court appeared to have taken too broad a view of FIFRA's preemptive effect, in *Worm I* we vacated its judgment and remanded for reconsideration. *Id.* at 1309.

After remand, in which the district court again granted the company summary judgment, finding most claims were preempted by FIFRA because they were based on alleged inadequacies in labeling and the remaining claims did not survive defendant's motion for summary judgment because they were "unsupported by evidence sufficient to warrant proceeding to trial," we affirmed. *Worm II*, 5 F.3d at 745. We noted that the Supreme Court had decided *Cipollone* in the interval between *Worm I* and *Worm II* and concluded that *Cipollone* "require[d] no change in the analysis of *Worm I* . . . ." *Id.* at 747. After stating once again that "[t]he only representations advanced in the record were those made" on EPA-approved labeling materials, we reaffirmed our holding that any claim that those labeling materials were inadequate was preempted. *Id.* at 747–48. Similarly, we concluded that "[b]ecause the Worms point to no statement made by American Cyanamid other than that required and approved by the EPA, their warranty claims are preempted." *Id.* at 749. Finally, we also reaffirmed our view that if "a state elects to recognize a breach of a FIFRA-created duty forms the basis for a state remedy . . . it is permitted to do so by 7 U.S.C. § 136v(b)." *Id.* In other words, while FIFRA does preempt a state's imposition of additional labeling requirements, it does not preempt a state's authority to monitor compliance with labeling or other requirements imposed by FIFRA.

We recognize that in the *Worm* cases, we have held that FIFRA preempts less state authority than have other courts. Both the Tenth and Eleventh Circuits have opined that in FIFRA Congress intended to preempt states from monitoring compliance with all FIFRA labeling violations. *See Papas v. Upjohn Co.*, 985 F.2d 516, 519 (11th Cir.) (*Papas II*) (stating, "FIFRA leaves states with no authority to police manufacturers' compliance with the federal procedures"), *cert. denied,* —— U.S. ——, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); *Arkansas–Platte & Gulf Partnership v. Van Waters & Rogers, Inc.*, 981 F.2d 1177, 1179 (10th Cir.) (*Arkansas–Platte II*) ("136v(b) . . . simply deprives the state of power to adopt *any* regulation"), *cert. denied,* —— U.S. ——, 114 S.Ct. 60, 126 L.Ed.2d 30 (1993). It seems to us that the Supreme Court's preemption analysis in *Cipollone* makes it clear that our narrower view of FIFRA preemption is preferable. *See also MacDonald v. Monsanto*, 27 F.3d 1021, 1024 (5th Cir.1994) ("FIFRA preempts conflicting state common law concerning the improper labeling of herbicides," but "136v(b) does not preempt . . . those

state laws concerned with herbicide labeling that do not impose any requirement 'in addition to or different from' the FIFRA requirements").[3]

As many recent FIFRA cases have noted, both the statute construed in *Cipollone* and FIFRA contain similar preemption provisions as to labeling, i.e., both prohibit a state from imposing any "requirements" in addition to federal labeling requirements. *Compare* Public Health Cigarette Smoking Act of 1969 (1969 Cigarette Act), 15 U.S.C. § 1334(b) (1982), *with* 7 U.S.C. § 136v(b). What courts have generally not addressed is that the statute construed in *Cipollone*, the 1969 Cigarette Act, contains an additional preemption provision for which there is *no* analogue in FIFRA. Thus, the 1969 Cigarette Act also prohibits a state from imposing any "requirement or prohibition ... with respect to the *advertising or promotion* of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." (emphasis added). There is no equivalent provision in FIFRA. Absent such a provision we believe that such requirements are not categorically preempted by FIFRA. Indeed, in *Cipollone*, the Supreme Court warned:

> When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicum of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state law from the substantive provisions.... *Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.*

*Cipollone*, —— U.S. at ——, 112 S.Ct. at 2618 (citations and internal quotations omitted) (emphasis added). Because in FIFRA Congress has expressly preempted the states from imposing "requirements for labeling or packaging in addition to or different from those required under this subchapter," and has *not* expressly preempted the states from imposing other kinds of requirements, we believe that the analysis of FIFRA in the *Worm* cases is consistent with the teachings of *Cipollone*.

■■■ The *Worm* analysis obviously makes it clear that some claims are preempted by FIFRA. First, any state law claim that would require the defendant to alter its EPA-approved warning label, labeling, or packaging to avoid liability is preempted. *Worm I*, 970 F.2d at 1308–09. Second, a failure to warn claim that contends that the *same* language that constitutes an EPA-approved label, labeling, or packaging is inadequate is preempted whether that language appears on a label, labeling, packaging, or elsewhere. *Worm II*, 5 F.3d at 748.[4] Third, an express warranty claim based on EPA-approved labeling materials is preempted. *Id.* at 749. However, *Worm I* and *Worm II* make it equally clear that at least one sort of claim is not preempted by FIFRA, i.e., "[i]f a state elects to recognize that a breach of a FIFRA-created duty forms the basis for a

---

3. The First and Seventh Circuits have not expressed an opinion as to whether 136v(b) preempts state authority to monitor compliance with FIFRA requirements. *See King v. E.I. Dupont De Nemours & Co.*, 996 F.2d 1346 (1st Cir.1993); *Shaw v. Dow Brands, Inc.*, 994 F.2d 364 (7th Cir.1993).

4. Lowe's claim in Count III that Sporicidin breached its implied warranty of merchantability is such a claim. This is so because under Maryland law, a warranty of "merchantability" warranties that goods are "fit for the ordinary purposes for which such goods are used, and ... *adequately contained, packaged, and labeled* as the agreement may require; and ... [c]onform to the *promises or affirmations of fact made on the container or label* if any." Md.Com.Law I Code Ann. § 2–314 (1992) (emphasis added).

While "other implied warranties [of merchantability] may arise from course of dealing or usage of trade," *id.*, Lowe made no such claim. Thus the only basis for her claim of breach of an implied warranty of merchantability is the EPA-approved labeling and packaging. This claim is, therefore, preempted by FIFRA under the teachings of *Worm II*.

Lowe's argument that preemption is improper because Sporicidin voluntarily withdrew its registration for CSS four years after her injury, for reasons unrelated to that injury, is without merit. As the district court noted, "there was an approved label during the operative time frame of this case." Therefore, if Lowe's claims were preempted by FIFRA in 1987 or 1989, they are still preempted, notwithstanding Sporicidin's voluntary withdrawal of its registration for CSS.

state remedy . . . it is permitted to do so. . . ." *Worm II*, 5 F.3d at 748 (citing *Worm I*, 970 F.2d at 1308). The central preemption question presented by this case is whether Lowe has alleged a "breach of a FIFRA-created duty." If she has, then, under the teachings of the *Worm* cases, Maryland could "elect[ ] to recognize" that breach as the "basis for a state remedy" and such a claim would not be preempted. *Id.* Determination of this question requires examination of § 136a(c)(1)(C) and § 136j(a)(1)(B) of FIFRA.

■ Section 136a(c)(1) states, "[e]ach applicant for registration of a pesticide shall file with the Administrator a statement which includes—. . . . (C) a complete copy of the labeling of the pesticide, *a statement of all claims to be made for it,* and any directions for its use." 7 U.S.C. § 136a(c)(1)(C) (emphasis added). Section 136j(a)(1)(B) provides:

> *[I]t shall be unlawful* for any person in any State to distribute, sell, offer for sale, hold for sale, ship, deliver for shipment, or receive and (having so received) deliver or offer to deliver to any person—. . . (B) any registered pesticide *if any claims made for it as a part of its distribution or sale substantially differ from any claims made for it as part of the statement required in connection with its registration under section 136a of this title.*[5]

7 U.S.C. § 136j(a)(1)(B) (emphasis added). Thus, it is clear that there is a "FIFRA-created duty" to file "a statement of all claims" made for a pesticide with the EPA, § 136a(c)(1)(C), and *not* to make "any claims for it as a part of its distribution or sale" that "substantially differ from any claims made for it as a part of th[at] statement." § 136j(a)(1)(B). Accordingly, the State of Maryland is not preempted from imposing common law liability on Sporicidin in the present case if Sporicidin's advertisements made "claims" "as a part of its distribution or sale" that "substantially differ" from "claims made for it as part of the statement required in connection with its registration."

A comparison of the claims made in the advertisements and the only claims made in "connection with" the registration of CSS, i.e. the labels, does not clearly establish—one way or the other—whether the advertisement claims "substantially differ" from the labeling claims. Some of the statements in the advertisements do seem at odds with the labeling claims. For example, the CSS label cautions, "avoid skin contact" and warns "may cause skin irritation," while portions of some of the advertisements proclaim that CSS "does not . . . irritate skin," that there is "no indication of skin irritation," and that "no gloves are necessary." Similarly, the CSS label states "avoid eye contact" and warns "causes eye irritation" but portions of the advertisements claim that CSS "does not irritate the eyes." On the other hand, the label states that when the CSS solution is *"more* concentrated than 1:16" it "may sensitize and may cause skin irritation." (emphasis added). At least arguably, a claim by Sporicidin that a CSS solution *less* concentrated than 1:16 does not cause skin irritation, would not "substantially differ" from the label. There is a statement somewhere in almost every advertisement in the record that states "1:16 dilution."

Sometimes that statement is very small and often it is not explained. Whether it constitutes sufficient notice that "1:16 dilution" of CSS is necessary to justify the claims of "no irritation," which often are more heavily featured, is a difficult question. Because even if none of Lowe's advertisement-based claims are preempted, the district court was still correct in granting summary judgment for Sporicidin, we need not resolve this knotty question.

### III.

■ Regardless of whether Lowe's advertisement-based claims were preempted, the district court's grant of summary judgment to Sporicidin here was proper because, as to each of these claims, Lowe utterly failed to make an adequate showing as to at least one

---

**5.** 7 U.S.C. § 1361 provides for civil fines the Administrator may impose for violations of FI-FRA as well as criminal penalties.

essential element of her cause of action.[6] As the Supreme Court has explained, a "moving party," like Sporicidin, is entitled to summary judgment when "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In Count I, Lowe summarily alleged that "Sporicidin negligently designed, manufactured, marketed, distributed, assembled, and sold the product." The district court appropriately characterized this count (and the other counts in the complaint) as "basically a notice pleading without specifics given." Lowe's subsequent memoranda and oral argument indicated that this claim was, in fact, an allegation that Sporicidin misrepresented in its advertisements the true dangers of CSS in the face of contrary knowledge and a contrary EPA-approved label. The district court characterized this as a "failure to warn" claim and asked, "what is the negligent manufacture evidence that you have that does not have a nexus with some failure to warn?" Lowe's counsel responded "it's produced in our affidavit of Dr. Reitberg." The court then asked, "[w]here in particular do you want me to look in" Dr. Reitberg's affidavit? Defense counsel's only response was to point to "the promotional materials" that Dr. Reitberg relied on. Examination of Dr. Reitberg's affidavit substantiates that, independent of an argument as to promotional advertisements, it supports no claim of negligent design or manufacture. Thus, in Count I Lowe alleged no claim different from that alleged in Count II, which is denominated a "negligent failure to warn" claim, but is actually also a claim of misrepresentation because of the advertisements.

In neither Count I nor Count II did Lowe actually contend that Maryland recognizes a cause of action for negligent misrepresentation or "negligent failure to warn" based on advertisements contrary to an EPA-approved product label. *Cf. Sloman v. Tambrands*, 841 F.Supp. 699, 703 (D.Md.1993) (stating that plaintiff "admits ... that there is no Maryland authority to buttress" her " 'failure to warn in advertising' claim"). Assuming that Maryland would recognize such a claim—whether denominated negligent misrepresentation or negligent failure to warn—it would, of course, require allegation and proof of causation. *See Gross v. Sussex, Inc.*, 332 Md. 247, 630 A.2d 1156, 1162 (1993) (one element of tort of negligent misrepresentation is that "plaintiff suffers damage proximately caused by the defendant's negligence"); *Faya v. Almaraz*, 329 Md. 435, 620 A.2d 327, 333 (1991) (to state cause of action for negligent failure to warn plaintiff must allege and prove breach of duty of care "proximately caused" injury).

Lowe's sole allegations as to causation were the very general assertions that "as a direct and proximate result of the allegations set forth in" the summarily pleaded counts, she "suffered severe and permanent injuries .... and has suffered and will suffer loss of income and earnings." She never alleged that she relied on the advertisements and that this reliance caused her to use CCS and so resulted in her injuries. Moreover, in the district court her counsel conceded that, in fact, there was *no* causal link between any Sporicidin statement and Lowe's injuries. The court asked, "[a]re you saying that ... because of a [Sporicidin] statement that was not approved ... [Lowe] suffered in consequence of that statement?" Lowe's counsel responded, "No, Your Honor." Furthermore, Lowe's counsel admitted that he could not make the argument "that there was a [Sporicidin] statement that was under challenge that is the basis of her claim." Since Lowe conceded that there was no casual link between her claims and any Sporicidin statement, the district court properly granted Sporicidin's motion for summary judgment on the misrepresentation or "failure to warn" claims in Counts I and II. *Cf. Whiston v.*

---

**6.** Sporicidin originally moved for summary judgment only on preemption grounds. We can, however, affirm the district court's grant of summary judgment on an alternative ground. *See Dennison v. County of Frederick*, 921 F.2d 50, 53 (4th Cir.), *cert. denied*, 501 U.S. 1218, 111 S.Ct. 2828, 115 L.Ed.2d 998 (1990); *see also Weiser v.*

*United States*, 959 F.2d 146, 147 (9th Cir.1992); *Lussier v. Louisville Ladder Co.*, 938 F.2d 299, 301 n. 2 (1st Cir.1991). This seems to be particularly appropriate here in light of the generous reading that both we and the district court have given to Lowe's skeletal complaint.

*Bio–Lab, Inc.,* 85 Ohio App.3d 300, 619 N.E.2d 1047, 1050 (1993) ("[a]ssuming *arguendo* [that plaintiff's warning label violated FIFRA] .... [t]here remained the factual issue of whether any failure ... to provide an adequate warning was the proximate cause of ... injury"). *See also Charleston Area Med. Ctr. v. Blue Cross & Blue Shield Mut. of Ohio, Inc.,* 6 F.3d 243, 247 (4th Cir.1993) ("Although issues of causation are to be decided by the jury, whether the evidence is sufficient to create a jury issue is solely a question of law to be determined by the court").

■ This rationale is also applicable to the claim stated in Count V. There Lowe summarily alleged that "Sporicidin designed, manufactured, marketed, distributed, assembled, and sold an unreasonably dangerous product," and, therefore, was "strictly liable" to her. However, as with Counts I and II, Lowe's memorandum and oral argument establish that her sole claim as to strict liability is based on asserted misrepresentations in the advertisements. For example, in support of this claim, Lowe again relied on the affidavit of Dr. Reitberg. Dr. Reitberg does not state that any inherent feature of CSS rendered it unreasonably dangerous; his only relevant assertion is "CSS is ... unreasonably and inherently dangerous as a result of promotional materials and representations regarding CSS ... distributed by Sporicidin International." Thus, Count V, like Counts I and II, requires a causal link between the alleged misrepresentation and the complained of injury. *Owens–Illinois, Inc. v. Armstrong,* 326 Md. 107, 604 A.2d 47, 52 (1992) ("Causation is a necessary element in any strict liability action"). Because Lowe admitted that no Sporicidin statement caused her injuries, the district court's grant of summary judgment on Count V of Lowe's complaint was proper for the same reason that it correctly granted summary judgment on Counts I and II.

■ Lowe's only remaining claims are breach of warranty claims. In Count IV, Lowe alleged breach of an express warranty. Under Maryland law: "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation." Md.Com.Law I Code Ann. § 2–313 (1992). Assuming that Sporicidin's advertisements constituted "affirmation[s] of fact" that "relate[d] to" a "good," that these "affirmations" were "part of the basis of the bargain," and that, therefore, these "affirmations" created an express warranty, summary judgment was still proper because once again there is an admission that no breach of express warranty (no Sporicidin "statement") caused Lowe's alleged injuries. *See Fischbach & Moore Intern. v. Crane Barge R–14,* 632 F.2d 1123, 1125 (4th Cir. 1980) (citing *Mattos, Inc. v. Hash,* 279 Md. 371, 368 A.2d 993 (1977)) ("In a warranty action, a plaintiff must show that a warranty existed, that the product did not conform to the warranty, and that the breach proximately caused the injury or damage"); *Rock v. Oster Corp.,* 810 F.Supp. 665, 667 (D.Md.1991) (granting summary judgment for defendant on plaintiff's express warranty claim because the alleged warranty was "immaterial" to the injury suffered by plaintiff), *aff'd,* 983 F.2d 1057 (4th Cir.1993).

■ Finally, in Count III, in addition to the implied warranty of merchantability claim, which we have held was preempted by FIFRA, as explained in *Worm II,* Lowe also alleged an implied warranty of fitness for a particular use. Under Maryland law such a warranty only arises, "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods...." Md.Com.Law I Code Ann. § 2–315. A "particular purpose" is different from "the ordinary purpose for which goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." § 2–315 cmt. 2.

Lowe nowhere alleged that her employer purchased CSS for a "particular purpose" that in any way differed from the "ordinary purpose" for which CSS was to be used, i.e., as a disinfectant, let alone that Sporicidin had "reason to know" that she was using CSS for a "particular purpose." Moreover,

in her own affidavit, the *only* use Lowe stated that she made of CSS was to "steriliz[e] hospital instruments;" this is precisely the "ordinary purpose" of CSS. Finally, Lowe's admission as to causation is an additional reason why summary judgment was properly granted on the breach of implied warranty of fitness for a particular purpose claim. *See Fischbach,* 632 F.2d at 1125.[7]

For these reasons, the order of the district court is

*AFFIRMED.*

---

**7.** For some reason, Lowe appears to believe that a telephone conversation she had with a Sporicidin manager is relevant to her express and implied warranty claims. It is not. First, Lowe nowhere alleged that this conversation preceded her use of CSS and the record suggests that it did not. Moreover, even assuming that this conversation did precede her use of CSS and that Lowe's description of the conversation was absolutely accurate, there was nonetheless nothing said to her by the Sporicidin manager that is pertinent to her claim and contrary to the CSS label, and so nothing that could constitute the basis for any non-preempted warranty claim. Lowe stated the "manager" told her "that Sporicidin had never had any complaints of anyone getting ill from working with CSS … that he had been soaking his feet in CSS in the evenings for about a year and that he had never gotten ill and that it was safe." Further, "[t]he manager asked [Lowe] if there was ventilation where [she] was using CSS." She said that "there was a vent but [she] did not know whether it provided enough ventilation." Lowe asked him if Sporicidin could send a representative to "the room in which [she] worked and check to make sure that the ventilation was adequate. He stated that Sporicidin would do this and make sure that it was O.K." The manager's statement concerning soaking his feet is not pertinent to Lowe's claim of breach of implied warranty of fitness for a particular use because she makes no claim that she used CSS in this way or suffered any injuries from using it in this way. *Cf. Rock,* 810 F.Supp. at 667. Moreover, with respect to the injury that she does allege—asthma due to inhalation of CSS—Lowe's affidavit establishes that the Sporicidin manager warned about using CSS without proper ventilation. This oral warning was entirely consistent with the EPA-approved warning. Accordingly, it provides no basis for a non-preempted express or implied warranty claim.