Charles H. **KUIPER,** Sr., Mae E. Kuiper and Charles A. Kuiper, Jr., Plaintiffs,

v.

AMERICAN CYANAMID CO., Defendant.

No. 93–C–566.

United States District Court, E.D. Wisconsin.

Feb. 15, 1996.

Robert H. Bichler, Hostak, Henzl & Bichler, Racine, WI, for Plaintiff.

Winthrop A. Rockwell, John P. Mandler, Faegre & Benson, Minneapolis, MN, Kenneth B. Ness, Ness & Foley, Milwaukee, WI, Lawrence S. Ebner, McKenna & Cuneo, L.L.P., Washington DC, for Defendant.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on defendant's motions to dismiss and/or for summary judgment. For the following reasons, both motions are granted and the case dismissed.

## FACTS

The undisputed facts are as follows. The defendant, American Cyanamid Company ("ACC"), manufactured and marketed a herbicide known as SCEPTER during the 1980's. (Plaintiffs' Memorandum Opposing Motion for Summary Judgment (Plaintiffs' Memo.") at 1.) SCEPTER was designed to control the growth of weeds in soybean crops. (Id.) It was first sold for general use in the midwest in 1986 and was offered for sale in Wisconsin in 1987. (Id.) The plaintiffs, Charles H. Kuiper, Sr., Mae E. Kuiper and Charles A. Kuiper, Jr., all doing business as Charles H. Kuiper & Son Farms (collectively, "the Kuipers"), first purchased SCEPTER in 1987 and incorporated it into their soybean fields that same year. (Id.) The Kuipers purchased the product from Donald Spangenberg of Farmers Grain & Supply ("Farmers Grain"), an independent dealer in agricultural supplies. (Id.) Prior to their purchase and use of the product in 1987, the Kuipers had not seen any of ACC's advertising or promotional materials regarding SCEPTER, other than the SCEPTER label itself. (See, ACC Reply Brief in Support of Motion for Summary Judgment ("ACC MSJ Reply") at 3, fn. 3., Ex. A at 58, 67–68.) The "Rotational Crop Restrictions" portion of the label stated that "follow" corn could be planted 11 months after the last SCEPTER application. (Id. at 4.) In addition, Spangenberg generally recommended the product, and allegedly made the specific representation that it was safe for "follow" corn. (Plaintiffs' Supplemental Brief Opposing Motion for Summary Judgment (Plaintiffs' Brief") at 8, fn. 5; Bichler Supp'l Aff., Ex. A. at 203.)

The references to "follow" corn relate to what is known in the farming trade as a "follow crop." Farmers like the Kuipers consistently rotate the crops they plant from one season to the next. (Plaintiffs' Memo. at 1.) A "follow crop" is the crop which the farmer intends to plant in a given field during the season following the current planting season. Thus, when purchasing herbicides for a given crop and season, one of the farmer's typical concerns is whether or not that herbicide poses any risks to the potential "follow crops" which might be planted the following season. In this case, the Kuipers intended to

(and did) plant corn as the 1988 "follow crop" to their 1987 soybean crop. (Id.) The corn was planted in fields in which SCEPTER was applied during the 1987 season. (Id. at 1–2.)

In June of 1988, field corn which had been planted in fields treated with SCEPTER the preceding year showed damage. (Id. at 2.) Upon seeing the damage, the Kuipers suspected it was the result of "carryover" problems with SCEPTER, "carryover" being a reference to injuries to follow crops from a prior year's herbicide application. (ACC Memorandum in Support of Motion to Dismiss ("ACC MTD"), Ex. A at 10, 18.) They had previously heard rumors to that effect about SCEPTER and had now observed damage to their own crops. (Id.) Accordingly, the Kuipers called Don Spangenberg, who came out to their farm and looked at their fields. (Id.) The Kuipers had asked Spangenberg to bring an ACC representative with him to view the fields, but it is unclear whether he did so. (Id. at 22.) The Kuipers did, however, discuss the problem with an ACC rep in 1988. (Id. at 20.)

The Kuipers also applied SCEPTER to their 1988 soybean fields. (Plaintiffs' Memorandum Opposing Motion to Dismiss at 1.) In 1989, they again rotated the soybean fields to corn and again experienced damage to the corn crop. (Id.; ACC MTD at 1–2.) The Kuipers contacted both Spangenberg and ACC, and this time representatives from both Farmers Grain and ACC inspected the affected corn crops. (ACC MTD, Ex. A at 22, 47.) During that 1989 inspection, the ACC representative admitted to the Kuipers that ACC was experiencing "big problems" with SCEPTER vis-a-vis follow corn and that SCEPTER was probably a factor in the damage to their 1989 corn crop. (Id.; Bichler Supp'l Aff. at Ex. C.) Settlement discussions ensued between the parties, and in 1990 ACC agreed to compensate the Kuipers for the damage done to their 1989 corn crop. (ACC MTD, Ex. A at 51.) Although the settlement only resolved the Kuipers claims with respect to their 1989 corn crop, it is undisputed that the parties also discussed at that time the possibility that SCEPTER had damaged their 1988 corn crop. (Id. at 52–53.) In-deed, on December 26, 1989, the Kuipers sent a damage claim to ACC itemizing the alleged "SCEPTER DAMAGE TO 1988 CORN CROP". (Id. at 92; Bichler Supp'l Aff., Ex. E.) This was followed by a March 27, 1990 claim letter to ACC, stating that the Kuipers, after seeing the SCEPTER damage to their 1989 corn crop, "now realize[d] that the same symptons [sic] and results were present in our 1988 corn crop." (Bichler Supp'l Aff., Ex. G.) The Kuipers asserted a loss of $118,278.87 due to SCEPTER carryover damage and enclosed a letter from Don Spangenberg of Farmers Grain in support of their claim. (Id.) The claim was rejected by ACC in a letter dated April 10, 1990. (Id., Ex. H.)

The Kuipers started this lawsuit over three years later, on April 30, 1993. The complaint alleges state common law and statutory causes of action for negligent misrepresentation, deceptive advertising, and punitive damages. ACC moves for summary judgment on all three claims on grounds of federal preemption and moves to dismiss the statutory claim on statute of limitations grounds. Because the motion to dismiss relies on factual materials outside of the initial pleadings, it shall also be treated as a motion for summary judgment.

## LAW

### I. SUMMARY JUDGMENT STANDARDS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Summary judgment is no longer a disfavored remedy. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327, 106 S.Ct. at 2555. It "can be a

tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.,* 794 F.Supp. 328, 330 (E.D.Mo.1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* Rather, the standard for summary judgment is now the same as that for a directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12. "A district judge faced with [a summary judgment motion] must decide, subject of course to plenary appellate review, whether the state of the evidence is such that, if the case

were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corporation,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). "[A] party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Company,* 853 F.2d 768, 771–72 (10th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Such principles insure that summary judgment is utilized "when it can be shown that a trial would serve no useful purpose." *Windham v. Wyeth Laboratories, Inc.,* 786 F.Supp. 607, 610 (S.D.Miss.1992).

## II. APPLICATION

### A. Preemption

■ The principle issue in this case is whether the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136–136y, preempts the Kuipers' state law causes of action. FIFRA provides comprehensive regulation of the sale and use of pesticides and other chemicals and includes, among other things, certain licensing and labeling requirements. There is a substantial body of case law dealing with preemption issues arising under FIFRA. The Court will not undertake a full exposition of that case law. For purposes of this motion, it suffices to say that FIFRA contains an express preemption clause which several circuit courts of appeals, including the 7th Circuit, have interpreted as preempting state common law causes of action, including "failure to warn" claims, premised upon or relating to defects in the labeling or packaging of a product regulated under FIFRA. The preemption provision, and the pertinent cases interpreting it, are as follows:

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C. § 136v(b). *See, Shaw v. Dow Brands, Inc.,* 994 F.2d 364, 369–71 (7th Cir. 1993); *see also, MacDonald v. Monsanto Co.,* 27 F.3d 1021, 1023–26 (5th Cir.1994); *Worm v. American Cyanamid Co.,* 5 F.3d 744, 746–49 (4th Cir.1993) (*"Worm II"*); *King v. E.I. DuPont De Nemours & Co.,* 996 F.2d 1346, 1347–51 (1st Cir.1993); *Papas v. Upjohn Co.,* 985 F.2d 516, 517–20 (11th Cir.1993) (*"Papas II"*); *Arkansas–Platte & Gulf v. Van Waters & Rogers, Inc.,* 981 F.2d 1177, 1178–80 (10th Cir.1993); *Bice v. Leslie's Poolmart, Inc.,* 39 F.3d 887, 888 (8th Cir.1994); *Taylor AG Industries v. Pure–Gro,* 54 F.3d 555, 559–61 (9th Cir.1995). Thus, insofar as the Kuipers' claims are premised upon inaccuracies or falsehoods contained in SCEPTER's labeling or packaging, such claims are clearly preempted by FIFRA.

■ This case, however, is not resolved so easily. The Kuipers argue that they are not relying upon any deficiencies in SCEPTER's labeling and packaging and are not asserting any "failure to warn" claims based on that labeling and packaging. Rather, the Kuipers are asserting misrepresentation claims based on false statements contained in ACC's advertising and promotional materials; specifically, representations regarding SCEPTER's safety vis-a-vis follow crops. Because the FIFRA provision at issue only discusses "requirements for *labeling* or *packaging* in addition to or different from those required" under FIFRA, the Kuipers argue that any claims based on misrepresentations in SCEPTER's advertising are not preempted. The 7th Circuit has yet to address this issue in the context of FIFRA. Other state and federal courts have, however, and there appears to be a split developing.

The Kuipers rely primarily on the Wisconsin Supreme Court's recent decision in *Gorton v. American Cyanamid Co.,* 194 Wis.2d 203, 533 N.W.2d 746 (1995). *Gorton* involved facts virtually identical to those alleged here. Gorton, the plaintiff, was a farmer who had applied SCEPTER to his 1987 and 1988 soybean crops. Like the Kuipers, Gorton plant-

ed corn as a follow crop in the spring of 1988, and by June of that year it was evident that the corn was not growing properly. In February of 1990, at or around the time in which the Kuipers were settling their 1989 crop claim, Gorton filed suit against ACC alleging a number of theories, including negligent misrepresentation concerning SCEPTER's safety vis-a-vis follow crops. In defense, ACC argued that FIFRA preempted Gorton's state common law tort claims. Like the Kuipers, Gorton argued, *inter alia,* that FIFRA does not preempt misrepresentation claims relating to ACC's advertising or marketing materials. The Wisconsin Supreme Court agreed with Gorton:

We follow the *Cipollone* reasoning on this point and hold that Gorton Farms' claim based on misrepresentation survives preemption under FIFRA. We see nothing in FIFRA that seeks to overturn the longstanding rules governing misrepresentation. On the contrary, FIFRA simply seeks uniformity in labeling and packaging and mandates that states shall not impose labeling or packaging requirements other than those prescribed by the statute itself. Further, our reading of sec. 136v(b) leads us to conclude that its preemptive effect does not encompass the general duty not to make false statements. Quite simply, claims based on misrepresentations of fact do not challenge the labeling of a manufacturer's product.

Here, Gorton Farms presented evidence that American Cyanamid made representations that SCEPTER was safe to follow corn. These representations were made through written product such as promotional materials, advertisements, technical reports, as well as through oral statements made by American Cyanamid's technical service representatives. All of the statements assuring that SCEPTER was "safe" and "extremely safe" had no relation to the labeling or packaging of the herbicide. Gorton Farms also presented evidence that American Cyanamid internal documents unequivocally showed that SCEPTER caused damage to follow corn crops in a variety of circumstances and yet, the company failed to disclose any informa-

tion other than assertions that SCEPTER was safe to follow corn.

*Gorton,* 533 N.W.2d at 755–56. At least one federal district court and one state appellate court appear to agree with *Gorton*'s conclusion. *See e.g., Burke v. Dow Chemical Co.,* 797 F.Supp. 1128, 1140–41 (E.D.N.Y.1992); *Malone v. American Cyanamid Co.,* 271 Ill. App.3d 843, 208 Ill.Dec. 437, 442–43, 649 N.E.2d 493, 498–99 (1995).

Other federal and state courts have reached the opposite conclusion, however, at least in cases where the alleged falsehoods or defects in the advertising materials are identical to language contained in the EPA-approved label or package. The *Worm II* case, for example, involved a farmer who applied SCEPTER to a soybean crop in 1987 and experienced damage to a follow corn crop in 1988. As here, the plaintiff alleged that both the SCEPTER label *and* ACC promotional materials stated that corn could be safely planted 11 months after application of the SCEPTER herbicide. The plaintiff asserted several claims against ACC, including state common law claims for negligent marketing and failure to warn. The latter claims stemmed from representations and/or omissions found in SCEPTER's "point-of-sale" or other promotional materials regarding crop rotation and SCEPTER's safety vis-a-vis follow crops. On summary judgment, the district court dismissed the latter two claims, holding that any claims based upon representations made on the SCEPTER label, "or in the materials accompanying the product", were preempted by FIFRA. The 4th Circuit agreed:

> The Worms also argue that even if American Cyanamid could not add language to its label, it could comply with any common law duty through statements made in other ways, for example through point-of-sale notices. To allow the Worms to argue that the warning language which appears on point-of-sale or other promotional material is inadequate when that language is identical to that approved by the EPA would in effect allow the establishment of an additional or different state

law requirement concerning adequate warning language.

*Worm II,* 5 F.3d at 748.

In *Papas II,* the plaintiff claimed he was injured by exposure to a pesticide regulated by FIFRA. He raised, *inter alia,* various state law failure-to-warn claims and argued that any such claims—"unrelated to labeling and packaging"—were not preempted by FIFRA. *Papas II,* 985 F.2d at 519. The 11th Circuit disagreed:

> [Appellants] contend that because the language of 136v refers only to "labeling or packaging," the section does not preempt failure to warn claims based on point-of-sale signs, consumer notices, or other informational materials that are "unrelated" to labeling and packaging. But any claims that point-of-sale signs, consumer notices, or other informational materials failed adequately to warn the plaintiff necessarily challenge the adequacy of the warnings provided on the product's labeling or packaging. If a pesticide manufacturer places EPA-approved warnings on the label and packaging of its product, its duty to warn is satisfied, and the adequate warning issue ends. Plaintiffs may not interfere with the FIFRA scheme by bringing a common law action alleging the inadequacy of, for example, point-of-sale signs. Because claims challenging the inadequacy of warnings on materials other than the label or package of a product necessarily imply that the labeling and packaging failed to warn the user, we conclude that these claims are also preempted by FIFRA.

*Id.*

The 4th Circuit discussed the issue a second time in *Lowe v. Sporicidin,* 47 F.3d 124 (4th Cir.1995). In *Lowe,* the plaintiff alleged she was injured by using defendant's disinfectant, a product which fell within the regulatory scope of FIFRA. Plaintiff raised a variety of legal theories, including failure to warn and negligent marketing, but eventually characterized her claims, much like the Kuipers do here, as stemming from misrepresentations contained in the defendant's advertising, as opposed to the product's label or packaging. *Id.* at 127. The district court dismissed the claims as preempted by FI-

FRA. The 4th Circuit, in discussing the preemption issue, first clarified the analysis contained in its *Worm II* decision:

> The Worm analysis obviously makes it clear that some claims are preempted by FIFRA. First, any state law claim that would require the defendant to alter its EPA-approved warning label, labeling, or packaging to avoid liability is preempted. *Second, a failure to warn claim that contends that the same language that constitutes an EPA-approved label, labeling, or packaging is inadequate is preempted whether that language appears on a label, labeling, packaging, or elsewhere.* Third, an express warranty claim based on EPA-approved labeling materials is preempted.

*Id.* at 129 (emphasis supplied; citations omitted). As for claims specifically based on the content of a defendant's advertising, which the 4th Circuit characterized as either "failure-to-warn" or "negligent misrepresentation" claims—*Id.* at 131 [1], the critical question for preemption purposes is whether the language relied upon in the advertisements "substantially differ[s]" from the language contained in the EPA-approved label:

> Thus, it is clear that there is a "FIFRA-created duty" to file "a statement of all claims" made for a pesticide with the EPA, § 136a(c)(1)(C), and not to make "any claims for it as a part of its distribution or sale" that "substantially differ from any claims made for it as a part of th[at] statement." § 136j(a)(1)(B). *Accordingly, the State of Maryland is not preempted from imposing common law liability on Sporicidin in the present case if Sporicidin's advertisements made "claims" "as a part of its distribution or sale" that "substantially differ" from "claims made for it*

as part of the statement required in connection with its registration."

*Id.* at 130 (emphasis supplied).

In *Taylor AG Industries v. Pure–Gro*, 54 F.3d 555 (9th Cir.1995), the plaintiffs alleged that their cotton crops were damaged by the application of a mixture of two defoliants regulated by FIFRA (DROPP and DEF–6). The labels on each defoliant recommended their mixture, but specified different dosage rates. Plaintiffs alleged that when purchasing the defoliants from a local retailer, the retailer recommended the dosage rate contained in the label and Product Guide for the DROPP defoliant, which happened to specify a higher dosage rate than the DEF–6 defoliant. The plaintiff sued both the manufacturer and the retailer under a variety of theories, including failure-to-warn and breach of express and implied warranties. The district court granted summary judgment dismissing all of the claims, in part on preemption grounds. On appeal plaintiffs argued, *inter alia*, that although FIFRA preempted failure-to-warn claims based on the product labels, the manufacturers could still be held liable for failure-to-warn claims based upon their advertisements. The 9th Circuit, following the lead of the 11th Circuit in *Papas II*, rejected this distinction:

> Appellants next contend that liability should be imposed upon the Manufacturers for failure to warn arising from alleged deficiencies in advertisements, point-of-sale warnings, and other materials distributed in connection with a sale. The Eleventh Circuit squarely addressed this issue and dismissed a claim for inadequate point-of-sale signs because "any claims that point-of-sale signs, consumer notices, or other informational materials failed adequately to warn the plaintiff necessarily challenge the adequacy of the warnings provided on the product's labeling or packaging." In

---

[1] This point is important insofar as the Kuipers argue that only "failure-to-warn" claims, and not misrepresentation claims, are preempted by FIFRA. In *Lowe*, the 4th Circuit said the underlying claims could be characterized as either failure-to-warn *or* negligent misrepresentation claims, and was prepared to preempt *both* claims upon a showing that the statements contained in the advertising were not "substantially differ[ent]" from statements contained in the EPA-

approved label. In any event, the Court does not think preemption should turn upon the name a plaintiff gives to his or her cause of action. If a statement in an advertisement is false, or contains a material omission, one could call it fraud, or one could call it a failure to warn. However one categorizes it, there is no principled reason for treating the claims differently for preemption purposes.

accordance with the Eleventh Circuit, we hold that Appellants' claim for inadequate point-of-sale warnings is preempted because their claim is premised ultimately upon the inadequacy of the product label. *Id.* at 561 (citations omitted). The *Taylor* case is also interesting insofar as it involved, as this case does, claims that the retailer made certain representations concerning the products at issue. Plaintiffs cited these representations as a basis for an express warranty claim against the retailer. The 9th Circuit first noted that FIFRA preemption applies equally to manufacturers and distributors. *Id.* at 562. The Court then held the express warranty claim preempted because there was no evidence that the "warranty" at issue varied at all from the language contained in the manufacturers' labels:

> Appellants allege that [the retailer] made an express warranty by directing them to the Product Guide for DROPP and DEF-6 mixing instructions. *There is no evidence that [the retailer] made any warranty that varied from the Manufacturers' labels and the Product Guide.* Thus, [the retailer's] liability for such an express warranty would be predicated upon a duty to provide information in addition to or different from that required by FIFRA. Imposing liability would circumvent the purposes of FIFRA by allowing states to require indirectly the dissemination of information that is outside the scope of the Manufacturers' labels.

* * * * * *

> We affirm the district court's ruling that Appellants' express warranty claim is preempted. *Appellants present no evidence establishing that [the retailer] made any statements that were inconsistent with or went beyond the labels of the Product Guide.*

*Id.* at 562–63 (emphasis supplied).

Finally, several other federal district courts, and at least two state supreme courts, have reached the same conclusion as the circuit courts in *Worm II, Papas II, Lowe,* and *Taylor,* holding that claims based on inadequacies or inaccuracies in a manufacturer's advertising or promotional materials are preempted by FIFRA where the language at issue is consistent with the language in EPA-approved labels or packaging. *See e.g., In re DuPont–Benlate Litigation,* 859 F.Supp. 619, 623–24 (D.P.R.1994); *Cattell v. Great Lakes Chemical Corp.,* 1995 WL 250400 at *7–8 (D.N.J.1995); *Sowers v. Johnson & Johnson Medical, Inc.,* 867 F.Supp. 306, 313 (E.D.Pa. 1994); *Pitts v. Dow Chemical Co.,* 859 F.Supp. 543, 549 (M.D.Ala.1994); *Goodwin v. Bacon,* 127 Wash.2d 50, 896 P.2d 673, 680–81 (1995); *Jenkins v. Amchem Products, Inc.,* 256 Kan. 602, 886 P.2d 869, 881–82 (1994).

Ultimately, in deciding the preemption issue on the facts of this case, the Court keeps in mind that questions concerning the extent to which FIFRA preempts state law causes of action are matters of federal law. *Jenkins,* 886 P.2d at 874–75. Thus, while the Court gives serious consideration to the views of the Wisconsin Supreme Court on such issues, it is not bound by that court's decision in *Gorton.* Moreover, the 7th Circuit has not yet addressed the precise preemption issue involved in this case. Accordingly, this Court is left to choose between the two conflicting lines of precedent detailed above, or to fashion its own alternative approach. After careful consideration, the Court agrees with the *Worm II* and *Papas II* line of cases. The Court reaches this conclusion for several reasons.

First, the *Gorton* decision primarily relies upon the U.S. Supreme Court's decision in the landmark preemption case, *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). *Cipollone* dealt with the scope of the preemption provision contained in the Public Health Cigarette Smoking Act of 1969, 15 U.S.C. §§ 1331–1340 ("PHCSA"). While holding that the PHCSA preempted several state law tort claims, the Supreme Court held that claims for fraudulent misrepresentation, similar to those raised here and in *Gorton,* could go forward. The PHCSA preemption provision precluded states from imposing any "requirement or prohibition *based on smoking and health* . . . with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." FIFRA's preemption provision is similar, though not identical,

precluding states from imposing "any requirements for labeling or packaging in addition to or different from those required under this subchapter." While courts have held that the two provisions are identical in scope, at least for purposes of determining whether they both reach state *common law* requirements, *see e.g., Shaw,* 994 F.2d at 371, there is one distinction in the language of the two statutes which the Court finds significant. That is, both statutes bar any state "requirements" concerning their respective subject matter, *i.e.,* "advertising or promotion" under the PHCSA and "labeling or packaging" under the FIFRA. However, the PHCSA adds an additional element, highlighted above: The state law "requirements" at issue must be "based on smoking and health". The *Cipollone* Court seized upon this latter language in finding that the fraud-in-advertising claims were not preempted by the PHCSA. The Court reasoned that such fraud claims were not predicated on a duty "based on smoking and health", but on a more general duty not to deceive, and therefore did not fall within the scope of the preemption provision. *Cipollone,* 505 U.S. at 528–29, 112 S.Ct. at 2623–24. FIFRA, however, does not state that the state law "requirements" at issue must be "based on" anything, much less a particular subject matter or objective. Rather, the statute clearly precludes "*any* requirements for labeling or packaging", making no distinction between requirements arising from a general duty not to deceive and requirements arising from a more specific duty based on "pesticides and health". Therefore, given the broader scope of the preemption language in FIFRA, *Gorton*'s reliance upon *Cipollone* in this regard seems misplaced.

Second, the reasoning of the *Worm II* and *Papas II* line of cases is more compelling. It strikes the Court as unduly mechanical to suggest that preemption turns upon *the source* of the representation at issue. In

enacting FIFRA, Congress obviously intended, among other things, to make the content and accuracy of pesticide labels a matter for exclusive federal jurisdiction. Thus, if the EPA approves a given representation or claim for inclusion in a pesticide label, a state cannot create a cause of action challenging the accuracy of that representation in the label. No one disputes this conclusion. Why, however, should the result be any different simply because the very same representation is made in an advertisement or other promotional material? Allowing such claims to go forward simply allows the states to accomplish indirectly what Congress tried to preclude them from doing directly. As suggested by *Lowe* and *Taylor,* a more sensible and practical approach focuses the preemption issue upon *the content and language* of the representation at issue. That is, if the advertisements at issue make representations that are substantially different from the representations made in the EPA-approved label or packaging, claims based on such representations will not be preempted by FIFRA.

Third, the facts of this case demonstrate how arbitrary the *Gorton* approach can be in certain situations. Here, while the Kuipers submitted several exhibits showing representations ACC made about SCEPTER in a number of non-label advertisements and promotional materials, there is no evidence in the record indicating that the Kuipers ever saw any of these materials before purchasing and applying SCEPTER in 1987. In fact, quite the opposite is true. The Kuipers admitted in their depositions that they never saw any advertisements relating to SCEPTER—other than the label—prior to their use of the product in 1987. Indeed, the only evidence of a non-label representation relied upon by the Kuipers in 1987 was Don Spangenberg's statement that it was safe to plant corn as a follow crop to a SCEPTER application.[2] This representation, of course, simply

---

**2.** In light of these facts, ACC makes what initially appears to be a strong, alternative argument in favor of dismissal. That is, if the Kuipers never saw any of the advertisements or promotional materials prior to their purchase and use of SCEPTER, there clearly is no showing of reliance upon the representations contained therein

and/or no showing of causation. However, under Wisconsin law, it appears that a manufacturer can be liable on a theory of negligent misrepresentation if it provides written materials to a retailer, containing erroneous statements, and it is foreseeable that the retailer may pass those statements or materials on to the customer. *See*

reiterates the sum and substance of the representation found on the label and read by the Kuipers, *i.e.*, that it was safe to plant corn as a follow crop 11 months after a SCEPTER application. Under the Kuipers' view, however, the representation becomes actionable if, in addition to their reading of the label, the representation happens to be repeated orally by a retailer selling the merchandise. The Court finds this approach to preemption arbitrary and untenable. Accordingly, the Kuipers claims are preempted by FIFRA.

## B. Statute of Limitations

 Even if the Kuipers claims were not preempted, their statutory claim for fraudulent advertising under Wis.Stat. § 100.18 is barred by the applicable statute of limitations. The statute of limitations for claims under this statute is three years and begins to accrue from "the occurrence of the unlawful act or practice which is the subject of the action." Wis.Stat. § 100.18. The representation at issue here, *i.e.*, Spangenberg's 1987 statement that corn could be planted as a follow crop to a SCEPTER application, clearly occurred more than three years prior to the filing of this lawsuit. However, because a claim under § 100.18 is a fraud cause of action sounding in tort, Wisconsin's "discovery rule" applies. Under that rule, a cause of action does not accrue until "the plaintiff discovers or in the exercise of reasonable diligence should have discovered not only that he has been injured but also that his injury may have been caused by the defendant's conduct." *Borello v. U.S. Oil Co.*, 130 Wis.2d 397, 410, 388 N.W.2d 140 (1986). Here, by their own admissions, the Kuipers were aware of an injury to their corn crops shortly after they were planted in 1988, and were informed by an ACC rep in 1989 that similar damage to their 1989 crop was likely due to SCEPTER carryover. Moreover, in December of 1989, and again in March of 1990, the Kuipers submitted a claim to ACC alleging that the injury to their 1988 corn crop was caused by SCEPTER carryover. Thus, more than three years prior to

the filing of the complaint (April 30, 1993), the Kuipers were aware that they had been injured and that the injury may have been caused by ACC's conduct. The claim is therefore untimely.

The Kuipers argue, however, that they were not aware that ACC *knew* that SCEPTER posed a danger to follow crops at the time that it marketed SCEPTER until discovery in the *Gorton* suit uncovered internal ACC documents proving ACC's prior knowledge. This cannot be the import of the discovery rule. In December of 1989, the Kuipers knew that their corn crops had been injured and that the injury may have been caused by SCEPTER carryover. They also knew that ACC—through Spangenberg—had represented that no such carryover effect would occur. Thus, in December of 1989, the Kuipers knew that they may have been injured by SCEPTER carryover and that ACC may have misrepresented SCEPTER's safety to follow crops. To further require the discovery of internal documents essentially *proving* ACC's malfeasance before the statute of limitations will begin to run guts the limitation of any meaning. Such a rule would, in most fraud cases, toll the statute of limitations indefinitely, as plaintiffs rarely obtain possession of the "smoking guns" referenced here by the Kuipers until a lawsuit is filed and discovery of the defendant's internal records becomes available.

**NOW THEREFORE, BASED UPON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Defendant's motions to dismiss and/or for summary judgment are granted and the case dismissed.

**SO ORDERED.**

---

*e.g., D'Huyvetter v. A.O. Smith Harvestore Products*, 164 Wis.2d 306, 475 N.W.2d 587, 596–97 (App.1991). Here, the Kuipers claim that Don Spangenberg told them that SCEPTER was safe for follow corn, and a reasonable inference can be drawn that Spangenberg obtained that information from SCEPTER's labeling or promotional materials.