970 F.2d 1301
 61 USLW 2026, 22 Envtl. L. Rep. 21,191,
18 UCC Rep.Serv.2d 410,
Prod.Liab.Rep.(CCH)P 13,204
 James T. WORM, Sr.; James T. Worm, Jr.; Robert C. Worm,
d/b/a Worm Brothers, d/b/a Jim Bob Farms,
Copartners, Plaintiffs-Appellants,
v.
AMERICAN CYANAMID COMPANY, a body corporate of the State of
Maine, Defendant-Appellee,
and
Southern States Cooperative, Incorporated, d/b/a Southern
States Cooperative, Incorporated--Preston Service, a body
corporate of the State of Virginia; Southern States Preston
Cooperative, Incorporated, a body corporate of the State of
Virginia, Defendants.
National Agricultural Chemicals Association, Amicus Curiae.
 No. 91-1749.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 4, 1992.
Decided June 19, 1992.
 
 Mark Ira Cantor, Cantor & Howard, P.A., Delverne A. Dressel, Baltimore, Md., argued, for plaintiffs-appellants.
 Raymond Gerard Mullady, Jr., Piper & Marbury, Baltimore, Md., argued (Brigit A. McCann, on brief), for defendant-appellee.
 Lawrence S. Ebner, McKenna & Cuneo, Washington, D.C., argued, for amicus curiae.
 Before WIDENER and NIEMEYER, Circuit Judges, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 In this appeal we consider for the first time the extent to which the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), - (1988), preempts state common law contract and tort actions which touch upon the field of pesticide packaging or labeling. The district court, after considering carefully the only circuit decisions that had by then addressed the question, (11th Cir.1991) (holding that FIFRA preempts common law tort actions that are based on the alleged mislabeling of a pesticide), petition for cert. filed, 59 U.S.L.W. 3825 (U.S. May 29, 1991) (No. 90-1837), and (D.C.Cir.) (apparently reaching the opposite result), cert. denied, (1984), determined that all of plaintiffs' state common law tort claims and breach of warranty claims for crop damages caused by a pesticide are "preempted by FIFRA as a matter of law."
 
 
 2
 Applying traditional principles of preemption, we conclude that Congress did not, expressly or by implication, preempt the field of pesticide regulation or a more narrowly defined field. Nevertheless, to the extent that Maryland law imposes a duty to provide a warning "in addition to or different from" federal pesticide labeling standards, it is preempted by conflicting with federal law. Because plaintiffs' complaint, however, alleges claims apart from those preempted, we vacate the judgment and remand the case for reconsideration in accordance with this opinion.
 
 
 3
 * James T. Worm, Sr., James T. Worm, Jr., and Robert C. Worm, who are engaged in commercial farming in Caroline County, Maryland, used a weed killer, known as "Scepter," on their soybean crop in the spring of 1987. Scepter is manufactured by American Cyanamid Company and, like almost all herbicides that are made, sold, or used in this country, is subject to federal regulation by the Environmental Protection Agency (EPA). Scepter is registered with the EPA in accordance with the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), - (1988).
 
 
 4
 In early May 1988, just more than eleven months after the initial application of Scepter to the soybean crop by the Worms, they planted sweet corn on 74 of the 114 acres which were treated with the herbicide. The Worms claim they considered the land to be safe for growing corn at that time because of the instructions on the Scepter label. Those instructions provided:
 
 ROTATIONAL CROP RESTRICTIONS
 
 5
 The following rotational crops may be planted after applying SCEPTER at recommended rates in soybeans:
 
 
 6
 1. Four months after last SCEPTER application:
 
 Small Grains
 Rice
 
 7
 2. Eleven months after last SCEPTER application:
 
 Corn
 Cotton
 Edible beans
 Grain sorghum
 Peanuts
 
 8
 Tobacco[.]
 
 
 9
 Materials distributed for the purpose of promoting the sale of Scepter likewise represented that corn could be safely planted eleven months after the application of Scepter to soybeans. These materials also warned that "[c]rops other than soy beans, such as cotton, corn, or vegetables may be injured by spray drift or other indirect contact with SCEPTER."
 
 
 10
 The Worms' crop failed. After the corn was found to be below commercial standards for sale, the Worms chopped and plowed under the entire crop. Although American Cyanamid maintains that the corn crop failed for reasons other than the application of Scepter to the Worms' fields, the company admits that it has experienced what is termed a "carryover effect" with Scepter, i.e., traces of the weed killer tend to remain in the soil for a longer time than originally predicted. This carryover can be devastating to crops, such as corn, which are particularly susceptible to destruction by Scepter. Indeed, American Cyanamid subsequently amended the label and promotional materials for Scepter "to avoid any future problems of this nature."
 
 
 11
 Following the destruction of the corn crop, the Worms filed suit in state court against American Cyanamid and its distributor, alleging that the loss of the crop was a proximate result of Scepter's carryover effect. In their complaint, the Worms alleged that the crop damage was caused by American Cyanamid's negligence in (1) "failing to adequately test" its product, (2) "failing to properly formulate" its product, (3) manufacturing Scepter "in non-conformity with its specifications and formulations," (4) marketing Scepter with knowledge that the label was inaccurate, and (5) "failing to warn users" that it was unsafe to plant sweet corn eleven months after applying Scepter to soybeans. The Worms also complained that American Cyanamid should be held strictly liable in tort for failing to warn of the condition of its defective product and that Scepter did not conform to express and implied warranties by the seller.
 
 
 12
 American Cyanamid removed the case to federal court based on diversity of citizenship and moved for summary judgment on the ground that the FIFRA preempts all of the Worms' claims. Reading their claims as essentially alleging that American Cyanamid failed in its duty to warn of a defective condition, the district court concluded that FIFRA, which provides no expressed private causes of action for damages, preempts all of plaintiffs' claims and therefore entered summary judgment in favor of American Cyanamid with respect to all claims. The Worms now appeal.
 
 II
 
 13
 The principles of preemption resolve conflicts between federal and state law on the authority of Article VI of the Constitution, which provides:
 
 
 14
 This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
 
 
 15
 U.S. Const. Art. VI, Sec. 2. From this Supremacy Clause flows the well-established principle that federal legislation, if enacted pursuant to the Congress' constitutionally delegated authority, can nullify conflicting state or local actions. See, e.g., (1824).
 
 
 16
 Preemption may occur on two bases, the first of which turns on discovering the intent of Congress. Congress may expressly provide that federal law supplants state authority in a particular field or its intent to do so may be inferred from its regulating so pervasively in the field as not to leave sufficient vacancy within which any state can act. See, e.g., (1947). But even absent an express or implied congressional intent to preempt state authority in a field, state law is nevertheless preempted by operation of law to the extent that it actually conflicts with federal law. See (1991); (1983).
 
 
 17
 Several underlying presumptions have been developed to aid in discovering the intent of Congress when it has not clearly expressed it and to determine when a conflict between state and federal law exists. In the circumstance where Congress is claimed to have preempted by implication a field of law traditionally occupied by state law, our jurisprudence and principles of federalism dictate that we presume that Congress did not intend to nullify state law unless a contrary intent is "clear and manifest." (1977) (quoting Particularly when it is urged that a deep-rooted body of product liability law has been preempted in a manner that effectively repeals long-standing state law remedies, we should be fairly assured of the congressional intent, because we must assume that the balance between federal and state law will not be disturbed "unintentionally by Congress or unnecessarily by the courts." see also (1971). When we address the question of whether state law actually conflicts with federal law, we resolve the more specific inquiries of whether "it is impossible to comply with both state and federal law" or "whether the state law stands as an obstacle to the accomplishment of the full purposes and objectives" of federal law. See (1984).
 
 
 18
 With these principles stated, we proceed to an examination of FIFRA, first to determine if Congress intended by its enactment to supplant state authority in the field, and if not, whether state tort and warranty law conflicts with the federal regulatory scheme.
 
 III
 
 19
 FIFRA, enacted originally in 1947 as a pesticide licensing and labeling statute, "was designed to work in harmony with the uniform state insecticide, fungicide and rodenticide act which was adopted in many States." S.Rep. No. 92-838, 92d Cong., 2d Sess. (1972) reprinted in , 3999. The Act was amended in 1972 to strengthen its standards and to increase the EPA's authority for enforcement. See (1984). The amendments, which were prompted by safety and environmental concerns, as well as "a growing perception that the existing legislation was not equal to [its] task" transformed FIFRA into "a comprehensive regulatory statute," regulating the labeling, sale, and use of pesticides both in intrastate and interstate commerce.
 
 
 20
 On the subject of FIFRA's intended effect on related or analogous state laws, , entitled "Authority of States," provides:
 
 
 21
 (a) In general
 
 
 22
 A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.
 
 
 23
 (b) Uniformity
 
 
 24
 Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.
 
 
 25
 (emphasis added). There is no language that provides that FIFRA supplants state authority in the field of registering, using, selling, or labeling pesticides, except to the extent stated in Sec. 136v. When we consider therefore whether in FIFRA Congress expressed an intent to occupy the entire field of pesticide regulation, we find no language to that effect, nor does the legislative history suggest it. See And the Congress has not failed to make such preemption clear when it desired to do so. See, e.g., Domestic Housing and Int'l Recovery and Financial Stability Act of 1983, (d), -18(e) (preempting any "State constitution, statute, court decree, common law, rule, or public policy"); Copyright Act of 1976, (a) (preempting rights "under common law or statutes of any State"); Employee Retirement Income Security Act of 1974, (a), (c)(1) (preempting all state "laws, decisions, rules, regulations, or other State action having the effect of law").
 
 
 26
 Our consideration of the question whether Congress, by implication, preempted state authority in the field by adopting a comprehensive regulation leaving no room for state maneuver in the field need not occupy us long because the Supreme Court has already resolved the issue. In the Court stated:
 
 
 27
 [W]e reject the position of some courts, but not the court below, that the 1972 amendments transformed FIFRA into a comprehensive statute that occupied the field of pesticide regulation....
 
 
 28
 More importantly, field preemption cannot be inferred.
 
 
 29
 * * * * * *
 
 
 30
 While the 1972 amendments turned FIFRA into a "comprehensive regulatory statute," the resulting scheme was not "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."
 
 
 31
 * * * * * *
 
 
 32
 FIFRA ... leaves substantial portions of the field vacant....
 
 
 33
 And addressing the specific interpretation of Sec. 136v(a), with regard to whether that section reveals a grant of authority to the states consistent with preemption of the field or an intent to leave open areas for state regulation consistent with an intent not to preempt, the Court concluded:
 
 
 34
 The specific grant of authority in Sec. 136v(a) consequently does not serve to hand back to the States powers that the statute had impliedly usurped. Rather, it acts to ensure that the States could continue to regulate use and sales even where, such as with regard to the banning of mislabeled products, a narrow pre-emptive overlap might occur.
 
 
 35
 (emphasis added).
 
 
 36
 By force of the same analysis conducted by the Supreme Court in to reach the conclusion that FIFRA does not preempt the field of regulating pesticides, expressly or by implication, we hold that Congress also did not reveal an intent to preempt any less broadly defined field. There is simply no evidence that Congress intended to supplant state authority in a field beyond the applicable scope of its own legislation. On the contrary we see in Sec. 136v(b) only a statement of the limits of the federal objectives underlying FIFRA for purposes of a Supremacy Clause analysis, and not an intent to usurp all power, even in the narrow field of pesticide labeling. Accordingly, we must address whether, by operation of Sec. 136v(b) and the Supremacy Clause, state tort and warranty law is preempted because of conflicts with FIFRA. To resolve that question we are instructed to determine whether it is "impossible to comply with both state and federal law" or whether "state law stands as an obstacle to the accomplishment of the full purposes and objectives" of federal law.
 
 IV
 
 37
 Section 136v(a) expressly prohibits a state from permitting a sale or use of a pesticide that is prohibited by the federal law, and Sec. 136v(b) prohibits any state labeling requirement "in addition to or different from" that imposed by federal law.
 
 
 38
 Because there is no suggestion in this case that federal law prohibits the sale or use of Scepter, we conclude that the statute does not preempt any state law which might regulate Scepter's sale and use. With respect to labeling, however, the federal law sets forth detailed requirements, see (1991), and directs that no additional or different labeling requirement may be imposed by the states. (b). Thus if to comply with Maryland law, American Cyanamid must violate federal law, the state law must yield. See (1963). Similarly state law must yield if in complying with it, American Cyanamid would be frustrating the objectives and purposes of federal law. (1941). In this regard, our task is made easier by the passage of Sec. 136v in which Congress has expressed its view that only state labeling requirements that are "in addition to or different from" the federal standards will frustrate its purpose. Thus if state law adopts or imposes a labeling requirement that is the same as the federal standard, even if the state law provides compensation or other remedies for a violation, so long as Congress chooses not to explicitly preempt the consistent law, it will not be said to be in conflict with federal law. See ("No doubt there is tension between the conclusion that safety regulation [of nuclear energy] is the exclusive concern of the federal law and a conclusion that a State may nevertheless award damages based on its own law of liability ... [but because] Congress intended to ... tolerate whatever tension there was ... [w]e can do no less.").
 
 
 39
 The Worms argue that state tort law, which provides a remedy for failure to provide an adequate warning to consumers can lead only to the payment of damages and not to a required label alteration. The distinction, they argue, avoids a conflict situation. In support, they rely on (D.C.Cir.) (holding that "if a state chooses to restrict pesticide use by requiring that the manufacturer compensate for all injuries or for some of these injuries resulting from the use of a pesticide, federal law stands as no barrier"), cert. denied, (1984).
 
 
 40
 We find the distinction illusory. If federal law mandates a specific label and permits nothing additional or different, it can hardly be urged that a state tort duty based on a warning requirement that is more elaborate and different does not conflict. The manufacturer in that case cannot comply with both. Implicit in the Worms' argument is a notion that common law tort duties are not regulatory. But surely a jury verdict resulting from a pesticide manufacturer's failure to warn of the dangers of the product has an effect no different from a legislatively enacted state regulation requiring the insertion of a specific warning on the pesticide label. Whether the standard is imposed by statute or common law, a pesticide maker willing to continue to face the consequences of its failure to change the warning is perfectly free to continue to market its product. And just as there can be no doubt that the state legislation would constitute a "requirement for labeling," cf. so too does the conflicting common law duty fall within the scope of Sec. 136v(b). As the Court of Appeals for the Eleventh Circuit stated in (11th Cir.1991), petition for cert. filed, (U.S. May 29, 1991) (No. 90-1837), "Allowing state common law tort actions based on labeling claims would permit state court juries to do what state legislatures ... are forbidden to do: impose requirements for labeling pesticides."
 
 
 41
 The Worms also argue that even if state common law suits can be termed labeling requirements within the meaning of Sec. 136v(b), all of the several specific tort and contract claims brought by them in this case are not inconsistent with those labeling requirements established by Congress in FIFRA or by the EPA in its regulations made pursuant to congressional directive. We agree. For example, the complaint alleges that American Cyanamid negligently failed to test Scepter to determine its "carryover" effect on rotational crops such as sweet corn. Whatever might be said with regard to some common law actions, we fail to see how a state-imposed standard of care relating to product design, manufacture, testing, and the like, can qualify as a labeling requirement under FIFRA. Likewise, where a state enables a purchaser of goods wholly or partially to rescind the sale of a pesticide which did not live up to the merchant's representations as to quantity, quality, or performance, then, in many circumstances, it cannot be said that the rescission is a regulation of labeling.
 
 
 42
 Finally, important to our Supremacy Clause analysis is the fact that FIFRA does not purport to preempt every requirement for labeling. Only state labeling requirements that are "in addition to or different from" those federally established requirements are forbidden. See (b). While we have not previously addressed the scope of this language, in the Supreme Court considered an interpretation of a similar preemption provision in the Federal Meat Inspection Act (FMIA), . Noting that Sec. 678 prohibits the imposition of "marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under" the FMIA (emphasis added), the Court invalidated a California law regulating meat labeling. However, the Court did not reason that the mere existence of a state label regulation offended the "in addition to, or different than" preemption clause. Rather, it held
 
 
 43
 the state law's requirement--that the label accurately state the net weight, with implicit allowance only for reasonable manufacturing variations--is "different than" the federal requirement, which permits manufacturing deviations and variations caused by moisture loss during good distribution practice.
 
 
 44
 Indeed, if the sole fact that a state chooses to regulate labeling, in any manner, were to constitute a state labeling requirement "in addition to" the federal scheme, then the "or different from" language would be read completely out of Sec. 136v(b). Such a reading would violate commonly understood principles of statutory construction. See, e.g., (1952) ("[W]e should not read out what as a matter of ordinary English speech is in."). We therefore construe the prohibition against state labeling requirements "in addition to" those in FIFRA to preempt the imposition of categories of labeling restrictions not provided by the federal law. While it may seem unlikely that new categories of labeling requirements could be established, given the breadth of the EPA's labeling regulations in force today, see (1991) (regulating contents, legibility, prominence, and, in certain cases, actual language to be used on pesticide labeling), it must be remembered that FIFRA, as written, contained few actual pesticide labeling restrictions. See generally, -. The need for labeling and packaging regulations was thus left largely to the discretion of the then newly established EPA. See . With regard to the types of labeling restrictions which do exist, we conclude that the states may regulate so long as any state law is not "different from" the federal standard. While we have not been advised that Maryland has done so legislatively, at oral argument counsel for the Worms observed correctly that if the Maryland common law recognizes a tort based on breach of a federally imposed standard, the Worms would be able to pursue that claim without conflicting with federal law.
 
 
 45
 We find support for our strict standard in determining whether a conflict exists in the recognition that FIFRA does not explicitly create a federal right of action to compensate persons who may be injured by misleadingly labeled pesticides. For "[i]t is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." see (4th Cir.1989) (en banc) (rejecting statutory construction of federal securities act that might preempt contribution under state law).
 
 
 46
 In summary, we hold that the language of Sec. 136v(b) manifestly ordains the preemption of the establishment or enforcement of any common law duty that would impose a labeling requirement inconsistent with those established by FIFRA, -, or the EPA in its regulations, . If to avoid breaching a state duty a pesticide producer is required to revise its pesticide labeling, then the duty, common law or otherwise, is preempted by Sec. 136v(b). Yet if the state imposes a duty to improve a product or to maintain a label in accordance with the federal standards, no conflict exists and FIFRA does not preempt.
 
 
 47
 Because the district court appears to have taken a broader view of FIFRA's preemptive effect, we vacate the judgment and remand for individual reconsideration of the state law claims in accordance with this opinion.
 
 
 48
 VACATED AND REMANDED.
 
 
 49
 . Since the district court issued its decision, an additional circuit has spoken on this subject. See (10th Cir.1992) (adopting view that FIFRA implicitly preempts the field of pesticide labeling); (9th Cir.1992) (avoiding question of whether advertising requirements in California Safe Drinking Water and Toxic Enforcement Act frustrate congressional purpose of FIFRA, since compliance with both state and federal provisions is possible).
 
 
 50
 . With some limited exceptions, (p) defines "labeling" as all "written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers" as well as "all other written, printed, or graphic matter--(A) accompanying the pesticide or device at any time; or (B) to which reference is made on the label or in literature accompanying the pesticide or device." While this definition is quite broad, it would not appear to include general advertising statements not made in connection with a particular sale. See (2d Cir.1989) (noting EPA's position that " 'labeling' comprises those materials designed to accompany the product through the stream of commerce to the end user").