Barbara S. LUCAS, Plaintiff,

v.

BIO–LAB, INC., Defendant.

No. 3:99CV707.

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 7, 2000.

Robert J. Haddad, Shuttleworth, Buloff & Giordano, Virginia Beach, VA, for Plaintiff.

Benjamin S. Boyd, Esquire, Ada R. Fernandez, Esquire, Piper Marbury Rudnick & Wolfe LLP, Washington, D.C., for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

Barbara S. Lucas instituted this personal injury action against Bio–Lab, Inc. and Wal–Mart Stores, Inc. asserting claims of failure to warn (Count I) and defective packaging (Count II). As a result of these alleged product defects, Lucas claims to have sustained injuries when she was transporting a chemical product, Aqua Chem, which is made and marketed by Bio–Lab and sold by Wal–Mart.[1] Specifically, Lucas alleges that, on May 16, 1998, she purchased a forty pound bucket of Aqua Chem three inch chlorine tablets to use in her swimming pool; that, thereafter, she left the bucket in a locked and sealed car while having lunch; and that, while driving home after lunch, she sustained injuries which led to numerous physical ailments proximately caused by inhaling the fumes from the chlorine tablets. The defective packaging claim, as alleged by Lucas in Count II, is that "the defendants failed to package their product in a safe manner by failing to individually package or wrap the chlorine tablets within the larger bucket container." Compl. ¶ 22.

Bio–Lab moved to dismiss Counts I and II, arguing that they are preempted by the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*, because they are predicated on the alleged insufficiency of the labeling and packaging of the product, topics which, according to Bio–Lab, are regulated by FIFRA and the regulations implementing it. At the first hearing on Bio–Lab's motion to dismiss, the motion to dismiss Count I (failure to warn), as preempted, was granted. The parties were requested, however, to conduct further research and briefing respecting whether the Environmental Protection Agency ("EPA") in fact has regulated pesticide packaging, an issue central to whether the claim presented in Count II has been preempted.

## DISCUSSION

### I. The Law Of FIFRA Preemption

Section 136v(b) of FIFRA provides that a State may not "impose or continue in effect any requirements for *labeling or packaging in addition to or different from those required under this subchapter.*" (emphasis added) In *Worm v. American Cyanamid Co.,* 970 F.2d 1301 (4th Cir.

1. Wal–Mart did not join in Bio–Lab's motion to dismiss and remains a Defendant.

1992) ("*Worm I* "), the Fourth Circuit held that the "language of § 136v(b) manifestly ordains the preemption of the establishment or enforcement of any common law duty that would impose a labeling requirement inconsistent with those established by FIFRA," 970 F.2d at 1308, and that, if to comply with State law, a manufacturer must violate federal law, the State law must yield. State law similarly must yield "if in complying with it, [a manufacturer] would be frustrating the objectives and purposes of federal law." *Id.* at 1306. The objectives and purposes of FIFRA include the strengthening of federal standards, increasing EPA authority for their enforcement, and providing a comprehensive and uniform regulation of the labeling, sale, and use of pesticides in both intrastate and interstate commerce. *See id.* at 1305.

A few days after the Fourth Circuit decided *Worm I*, the Supreme Court of the United States decided *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), in which the Court considered the preemptive scope of the Federal Cigarette Labeling and Advertising Act of 1965 and the Public Health Cigarette Smoking Act of 1969, two statutes that also contain explicit language addressing the preemptive scope of their labeling requirements. Articulating the judicial approach to analysis of federal statutes that expressly address preemption, the Court defined the task as first determining whether the relevant statutory provisions reliably indicate congressional intent respecting preemption of State authority, and, if so, then interpreting the express language. *See* 505 U.S. at 517, 112 S.Ct. 2608. Of central importance to the issue presented here was the Supreme Court's conclusion in *Cipollone* that, in considering the preemptive provisions of a federal statute, "[t]he phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law

rules." *Id.* at 521, 112 S.Ct. 2608. Thus, *Cipollone* made the preemptive provisions of the statutes there at issue applicable to state common law claims, such as the one raised in Count II of Lucas' Complaint.

In 1993, the Fourth Circuit decided *Worm v. American Cyanamid Co.,* 5 F.3d 744 (4th Cir.1993) ("*Worm II* ") wherein the Court of Appeals rejected the plaintiffs' efforts to put forward state law defective labeling claims based on the assertion that a duty to warn created by State common law is not "in addition to or different from" the labeling duties defined by federal law, *i.e.,* in FIFRA. *Id.* at 748. In *Worm II,* the plaintiffs' theory would have permitted recovery even though the manufacturer's label had been approved by the EPA.

Two years later, in *Lowe v. Sporicidin International,* 47 F.3d 124 (4th Cir.1995), the Fourth Circuit applied the principles of *Cipollone* to various State law claims assertedly preempted by FIFRA. In *Lowe,* a hospital worker sued the manufacturer of a cold sterilizing solution (disinfectant), alleging that she had suffered injury as a result of inhaling the solution. Lowe asserted claims for negligent design, manufacture, marketing and distribution, for negligent failure to warn, for breach of express and implied warranties and for strict liability in tort. In *Lowe,* the Court of Appeals reviewed *Cipollone* and its own decisions in *Worm I* and *Worm II* and held that:

> First, any state law claim that would require the defendant to alter its EPA-approved warning label, labeling, or packaging to avoid liability is preempted (citing *Worm I* ). Second, a failure to warn claim that contends that the same language that constitutes an EPA-approved label, labeling, or packaging is inadequate is preempted whether that language appears on a label, labeling, packaging, or elsewhere (citing *Worm II* ). Third, an express warranty claim

based on EPA-approved labeling materials is preempted (citing *Worm II* ). *Lowe*, 47 F.3d at 129–30. Finding that several of Lowe's claims were based on advertising statements that allegedly were inconsistent with the EPA-approved labeling, the Fourth Circuit affirmed the dismissal of claims based on that premise as preempted by FIFRA. Lowe's other claims were held to fail as a matter of law for reasons not here pertinent.[2]

As Bio–Lab correctly argues, *Lowe*, in the language quoted above, construed *Worm I* to have held that "any claim that would require the defendant to alter its EPA-approved label, labeling or packaging to avoid liability is preempted." *Lowe*, 47 F.3d at 129. That, however, is an over-reading of *Worm I* because there the Court of Appeals was concerned only with the issue of labeling and, moreover, with a label, the text of which actually had been approved by EPA. Hence, to the extent that *Lowe* makes reference to packaging, that language is *dicta* where the packaging has not been approved by the EPA.

And, as Bio–Lab also correctly points out, *Lowe* construed *Worm II* to have held that: "a failure to warn claim that contends that the same language that constitutes an EPA-approved label, labeling or packaging is inadequate is preempted whether that language appears on a label, labeling or packaging." *Lowe*, 47 F.3d at 129. However, because *Worm II* did not involve EPA-approved packaging, that construction of *Worm II* is not controlling except to the extent that there is EPA-approved labeling on the packaging or there is EPA-approved packaging, circumstances that are not presented here, nor, for that matter, in *Worm I, Worm II* or *Lowe*.

Thus, whether a defective packaging design claim of the sort presented by Lucas is preempted when the EPA has not approved the packaging is an unresolved issue in this circuit. However, recently, a district court in this circuit was presented with that question under facts quite similar to those presented here. *Jeffers v. Wal–Mart Stores, Inc.*, 84 F.Supp.2d 775 (S.D.W.Va.2000). In *Jeffers*, a maintenance worker filed an action against a manufacturer of pesticide products for injuries sustained as a result of exposure to a pesticide which had leaked from a ruptured container. Having surveyed the field, the court, in *Jeffers*, recognized that neither the Supreme Court of the United States nor the Fourth Circuit had determined whether State common law claims for defective packaging had been preempted by FIFRA in circumstances where the packaging had not been approved by the EPA. The court then analyzed FIFRA and the EPA's packaging regulations and was persuaded that the EPA had chosen to exercise regulatory authority over pesticide packaging only in the area of child-resistant packaging, and then concluded that:

> [s]ince no EPA regulations exist with regard to the subject matter of Plaintiff's claims, her common law causes of action are not "in addition" to any EPA regulation. Nor are such claims "different from" any EPA regulations.

84 F.Supp.2d at 779.

A similar result obtained upon a similar analysis in *Lyall v. Leslie's Poolmart*, 984 F.Supp. 587 (E.D.Mich.1997), wherein the court held that FIFRA's preemption clause did not foreclose a plaintiff's claim against a manufacturer for defective package design involving chlorinated tablets where neither FIFRA nor its implement-

**2.** Contrary to Bio–Lab's assertion, FIFRA preemption analysis set forth in *Worm I, Worm II* and *Lowe* was unaffected by the Supreme Court's decision in *Medtronic Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), in which the Supreme Court held that generally applicable State law, not in direct conflict with the federal Medical Device Amendments Act of 1976, was not preempted by that particular federal law. *See Lescs v. William R. Hughes, Inc.*, No: 97–2278, 1999 WL 12913 (4th Cir. Jan.14, 1999) (per curiam).

ing regulations addressed the mode of product packaging. *See* 984 F.Supp. at 595. The court, in *Lyall,* also canvassed FIFRA and the EPA's packaging regulations and, as in *Jeffers,* concluded that "FIFRA itself does not provide any specific packaging requirements," *Lyall,* 984 F.Supp. at 595, and that:

Through FIFRA, Congress delegated authority to the EPA to regulate packaging. The EPA has only exercised this authority in the context of requiring child-resistant packaging. There are no specific design requirements for containers housing the chlorinator tablets at issue in this case. Like the pacemaker in dispute in Medtronic [Inc. v. Lohr],[3] the container in which the tablets were placed was not required to meet specific statutory or regulatory guidelines. Under the circumstances, where there is no actual conflict between any federal requirement and plaintiffs' state tort law claims for defective packaging, FIFRA does not preempt plaintiffs' negligent design and manufacturing claims relating to the container.

*Lyall,* 984 F.Supp. at 595. And, *Lyall* rejected the argument, also made here by Bio–Lab, that *Worm II* requires a finding that the defective packaging claim is preempted, because in *Lyall,* unlike *Worm II,* the defective packaging claim was not merely a restatement of the preempted failure to warn claim.

Of course, *Worm II,* like *Worm I,* was based in significant part on the fact that the EPA had issued comprehensive labeling regulations to which the labels there at issue had been subject and through which they had been approved. *See Worm I,* 970 F.2d at 1306; *Worm II,* 5 F.3d at 748. As explained in *Jeffers,* "[t]he absence of packaging approval procedures and regulations, combined with the Supreme Court's holding in *Medtronic,* dictates that Plaintiff's packaging claims are not preempted." *Jeffers,* 84 F.Supp.2d at 781. The refer-

ence to *Medtronic* was that part of the Supreme Court's opinion which held that:

this [is] quite unlike a case in which the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers. *Rather, the federal requirements reflect important but generic concerns about device regulation generally, not the sort of concerns regarding a device or field of device regulation that the statute or regulations were designed to protect from potentially contradictory state requirements.*

*Jeffers,* 84 F.Supp.2d at 781 (*quoting Medtronic, Inc. v. Lohr,* 518 U.S. at 501, 116 S.Ct. 2240) (emphasis added).

The United States Court of Appeals for the Third Circuit also has confronted this issue and has held that defective packaging claims based on State common law, virtually identical to those asserted by Lucas, are not preempted by FIFRA. *See Hawkins v. Leslie's Pool Mart, Inc.,* 184 F.3d 244, 252–255 (3d Cir.1999). Specifically, the Third Circuit held:

Here, the record reveals no evidence that the EPA considered the packaging methods at issue. Additionally, it is undisputed that no federal requirements exist in the area of pesticide packaging, exclusive of child-resistant packaging. Accordingly, we will not infer that the EPA approved the packaging for the chlorinator tablets after weighing the competing interests and reaching an 'unambiguous conclusion.' Therefore, in keeping with the reasoning in *Medtronic,* we conclude that allowing Hawkins's defective packaging claims would not impose state law requirements that are *in*

**3.** 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

*addition to or different from* federal regulations.

*Id.* at 254.

Because there is no actual conflict between federal law (in FIFRA) and State law (defective packaging claim), the recent decision of the Supreme Court in *Geier v. American Honda Motor Co.,* ——— U.S. ———, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), does not alter the results in *Jeffers, Lyall* and *Hawkins.* In brief, *Geier* was an action instituted by a plaintiff injured in a vehicle accident who sued the automobile manufacturer, Honda, for negligent failure to equip the car with a driver's side airbag. The Supreme Court considered whether the Federal Motor Vehicle Safety Standard (FMVSS), 15 U.S.C. § 1381 *et seq.,* which required auto manufacturers to equip some, but not all, 1987 vehicles with passive restraints, preempted plaintiff's action. The FMVSS contains an express preemption provision providing that "no State ... shall have any authority to establish ... any safety standard applicable to the same aspect of performance of such vehicle ... which is not identical to the Federal standard." 15 U.S.C. § 1392(d) (1988 ed.). The FMVSS also contains a "savings clause," which provides that "[c]ompliance with" a federal safety standard "does not exempt any person from liability under common law." The issue in *Geier* was whether the savings clause would operate to save a State law tort action from the application of "implied [conflict] preemption," *Geier,* ——— U.S. ——— at ———, 120 S.Ct. 1913, 1918, 146 L.Ed.2d 914, that is, from preemption on the basis that there existed an "actual conflict" between the federal standard and the state tort action. The Court concluded that the savings clause did not preclude preemption under the traditional "actual conflict" preemption analysis, and therefore that a State tort action which actually conflicted with the federal statute—as Geier's tort claim actually did—would be preempted by the federal statute. FIFRA contains no savings clause, and hence *Gei-*

*er* does not alter the analyses made in *Jeffers, Lyall* and *Hawkins.*

## II.  Bio–Lab's Contentions

Apart from contending that the Fourth Circuit's decisions in *Worm I, Worm II* and *Lowe* require a finding of preemption here, Bio–Lab makes two principal arguments in favor of preemption. First, Bio–Lab argues that any State law defective packaging claim necessarily creates a requirement "different than and in addition to" FIFRA's requirement because any such claim perforce must include more than, and must be different from, the only aspect of packaging (child-resistant packaging) for which EPA has established packaging requirements. Second, Bio–Lab argues that EPA, in fact, has regulated pesticide packaging and that the act of registering Aqua Chem also constituted EPA approval of the product's packaging.

When considering these points, it is helpful to understand that, although FIFRA itself does not address the design of pesticide packaging, the statute clearly grants the EPA broad powers in the regulation of the packaging of pesticides by providing that the EPA "*shall ... promulgate regulations for the design* of pesticide containers that will promote the safe storage and disposal of pesticides." 7 U.S.C. § 136q(e) (emphasis added). EPA has promulgated extensive requirements for child-resistant packaging. *See* 40 C.F.R. Part 157, Subpart B—Child–Resistant Packaging, §§ 157.20–36. EPA's regulations do not define the term "packaging" except in the child-resistant packaging regulations, where the term is defined to include the "immediate container or wrapping, including any attached closure(s), in which the pesticide is contained for distribution, sale, consumption, use or storage." 40 C.F.R. § 157.21(c). And, except for Bio–Lab's argument that EPA has regulated packaging because of the registration procedure, it is undisputed that EPA has promulgated no other packaging regulations. *See* 40 C.F.R. Part 157, Packing

Requirements For Pesticides And Devices (no regulation other than Subpart B for Child–Resistant Packaging). With these points in mind, it is appropriate to assess Bio–Lab's contentions.

### 1. Bio–Lab's Statutory Construction Argument

■ Bio–Lab's first line of defense is that, because EPA already has promulgated regulations for child-resistant packaging, any State tort law claim for defective packaging, whether addressed to child-resistant packaging or not, is, *a fortiori,* "in addition to or different from" the requirements of FIFRA. This argument fails for several reasons.

First, it is at odds with the statutory text of FIFRA's preemption clause, which forecloses only those State requirements for packaging that are "in addition to or different from *those required under this subchapter.*" And, "those required under the subchapter" clearly means requirements imposed by regulations promulgated by EPA under the authority conferred by Congress. As to the design of pesticide packaging, the authority to promulgate regulations is conferred on EPA by 7 U.S.C. § 136q, which provides that, "[n]ot later than 3 years after the effective date of this subsection, the [EPA] shall ... promulgate regulation *for the design of* pesticide containers that will promote the safe storage and disposal of pesticides." 7 U.S.C. § 136q(e)(1)(A) (emphasis added). Those regulations, when issued, were intended to ensure, *inter alia,* "safe use of the containers, including elimination of ... leakage of pesticides from the container." 7 U.S.C. § 136q(e)(1)(B).

Notwithstanding the three year time limit set by Congress, EPA to date has not yet exercised that authority. Indeed, the child-resistant packaging regulations were proposed by EPA in 1984 and took effect in 1986, see 51 Fed.Reg. 21276 (June 11, 1986), more than two years before Section 136q(e)(1)(A) was enacted. Hence, except for the child-resistant packaging regulations (which are not implicated here), there are no federal packaging requirements to which a State law claim could add or from which it could differ.[4]

If accepted, Bio–Lab's argument would mean that, once EPA has spoken on one aspect of packaging, no matter how limited, State law respecting all other aspects of packaging design is foreclosed even though there are no EPA regulations setting requirements for those aspects of packaging presented by the State law claim.[5] That interpretation of FIFRA strains the text of the statute beyond its plain meaning and beyond any inference which logic would permit. Indeed, it would require rewriting FIFRA's preemption clause to read that States "may not impose any ... requirements for ... packaging in addition to or different from those required, or which could be required, under this subchapter."

Second, Bio–Lab's construction of FIFRA also would have the statute operate in a way not generally consistent with regulatory law wherein the implementation of a regulation entrusted to an agency bespeaks that it "has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers." *Medtronic, Inc.,* 518 U.S. at 501, 116 S.Ct. 2240. To the contrary, EPA has not exercised its authority to implement regulations imposing requirements for pesticide packaging except in a limited

---

4. That was true in May 1998 when Lucas purchased the Aqua Chem. And, it remains the case today.

5. This action presents no occasion to consider the circumstance when EPA has considered, but rejected, packaging design criteria, the absence of which are the basis for a defective packaging design claim.

area not at issue in the State law claim asserted by Lucas. Thus, as in *Medtronic*, there is no agency action "regarding [ ] specific [packaging] or field of [packaging] regulation that the statute or regulations were designed to protect from potentially contradictory state requirements." *Id.*

■ Third, Bio–Lab's construction of FIFRA's preemption clause would effectively establish a presumption in favor of preemption, a precept at odds with the Supreme Court's long-standing instruction that there is a presumption against preemption unless there is a clearly expressed Congressional purpose to the contrary. *See Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240; *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Bio–Lab has articulated no basis, in the statute or its legislative history, for concluding that Congress expressed a purpose to replace State law respecting the form, mode or design of pesticide packaging where the agency to which it delegated regulatory authority over pesticide packaging has declined to exercise that authority. To accept that precept would be to leave unprotected—while EPA, for whatever reason, has declined to exercise its regulatory powers—those whom Congress intended to protect when it gave the EPA authority to regulate pesticide packaging. A result of that sort would turn the Congressional purpose behind FIFRA on its head.

Finally, Bio–Lab's argument is at odds with the substantial base of decisional law that addresses FIFRA, its implementing regulations, its preemption clause and their relationship to State law defective packaging claims. As explained in Part I, the most harmonious accommodation of the relative federal and State interests inevitably at tension in any preemption analysis is the well-reasoned approach taken in *Jeffers, Lyall* and *Hawkins*.[6]

### 2. Bio–Lab's "Existing Regulation And Approval Of Packaging" Argument

In another effort to circumvent the decisions in *Jeffers, Lyall* and *Hawkins* as well as the obvious absence of any EPA regulations imposing packaging design requirements applicable to Aqua Chem, Bio–Lab contends that EPA's product registration regulations, in effect, constitute product packaging regulations, and that, by registering Aqua Chem, EPA approved the design of its packaging. To understand these umbilically connected, and somewhat superficially appealing, contentions, it is necessary to examine the product registration process.

### a. The Registration Process

To begin, FIFRA sets forth a procedure for registering pesticides. *See* 7 U.S.C. § 136a(c). To secure registration, the manufacturer must submit an application in the form prescribed by EPA. *See* 40 C.F.R. § 152.50. The requirements set forth in EPA's application procedure must be complied with for the pesticide to be registered. *See* 7 U.S.C. § 136a(c)(6). EPA has promulgated extensive regulations respecting its registration process for pesticides. *See* 40 C.F.R. Part 152–PESTICIDE REGISTRATION AND CLASSIFICATION PROCEDURES, §§ 152.1 through 152.500. Those registration regulations impose extensive registration requirements respecting product labeling. *See* 40 C.F.R. Part 156–LABELING REQUIREMENTS FOR PESTICIDES AND DEVICES, §§ 156.10 & 200 through 212. The registration procedure requires the applicant to submit the text of the product labeling with the application. *See* 40 C.F.R. § 152.50(c) and (e).

In contrast, to its labeling requirements, EPA's registration regulation respecting packaging are quite sparse. In fact, in 40

---

6. As explained in Part I, those decisions do not run afoul of the Fourth Circuit's decisions in *Worm I, Worm II* and *Lowe*. See also *Haw-* *kins v. Leslie's Pool Mart, Inc.*, 184 F.3d 244, 253 (3d Cir.1999) (harmonizing its approach with those of the Fourth Circuit).

C.F.R. Part 157, entitled PACKAGING REQUIREMENTS FOR PESTICIDES AND DEVICES, EPA has enacted only Subpart B, relating to Child–Resistant Packaging, 40 C.F.R. §§ 157.20 *et seq.* The only packaging information required to be submitted by the registration regulations is a "certification relating to child-resistant packaging." 40 C.F.R. §§ 107, 108. Unlike its labeling requirements, EPA's packaging requirements address but a small component of the regulated topic—package design to protect children five years of age or younger. *See* 40 C.F.R. § 157.21(b).

The application form requires a statement whether child-resistant packaging is being used and, if so, a certification to that effect. *See* Defendant's Motion to Dismiss, Ex.'s 2 and 3 (EPA Form, Section III). Section III of the form also requires the applicant to state whether "unit packaging is used," a concept defined only in Subpart B—Child–Resistant Packaging, 40 C.F.R. § 157.21, and imposed, as a substantive packaging requirement, only as part of the child-resistant packaging requirements. *See* 40 C.F.R. § 157.27.[7]

The registration application also requires the applicant to submit certain data about the product. *See* 40 C.F.R. Part 158—DATA REQUIREMENTS FOR REGISTRATION, §§ 158.20 through 158.740 (not all numbers used). The standards, or acceptable protocols, for conducting the tests that generate the required data are set forth in separately-published Pesticide Assessment Guidelines.[8]

Among the product data which must be submitted with the application for registration is that specified by the "Product Chemistry Data Requirements" 40 C.F.R. Part 158, Subpart C. That data includes:

stability, oxidizing and reducing action, flammability, explodability, storage stability, corrosion, and dielectric breakdown voltage. For example, a study of the corrosion characteristics of a pesticide is needed to evaluate effects of the product formulation on its container. If the pesticide is highly corrosive, measures can be taken to ensure that lids, liners, seams or container sides will not be damaged and cause the contents to leak during storage, transport, handling, or use. The storage stability study provides data on change (or lack of change) in product composition over time. If certain ingredients decompose, other new chemicals are formed whose toxicity and other characteristics must be considered.

40 C.F.R. § 158.150(b)(4)(iii). The data about a product's composition that must be submitted in the registration process can also be the basis upon which EPA may impose special packaging requirements.[9] It is, however, undisputed that EPA imposed no special packaging requirements in connection with the registration of Aqua–Chem chlorinator tablets. And, neither the Product Chemistry Data nor any other provision of Part 158 requires the submission of packaging design information.

7. Section III also requires a statement (Yes or No) whether the product is water soluble and identification of what the container is made of (*e.g.* plastic, metal, glass, paper or other).

8. Bio–Lab submitted the 1982 Pesticide Guidelines. The EPA amended the Guidelines in 1988. The 1988 Guidelines, which would have applied to the product at issue, did not materially alter the sections pertinent to this case. *See* Mitchell Aff. ¶ 4. In 1997, the EPA again amended the Guidelines, but those amendments would not have applied to the product in question here. Bio–Lab repre-

sents that it was unable to obtain a copy of the 1988 Guidelines because the National Technical Information Service, which publishes the Guidelines, did not have an available copy.

9. The Product Chemistry Data Requirements provide: "[b]ased on conclusions concerning the product's composition and its toxic properties, appropriate use restrictions, labeling requirements or special packaging requirements may be imposed." 40 C.F.R. § 158.150(b)(1)(ii).

EPA also has issued Pesticide Assessment Guidelines which set forth acceptable protocols for conducting tests to develop the required data. *See* 40 C.F.R. § 158.70. The forward to the Pesticide Assessment Guidelines explains that "Subdivision D describes protocols which *may be used* to perform Product Chemistry Testing to Support the registration of pesticides under [FIFRA]. *It is a nonregulatory companion* to 40 CFR Part 158, Data Requirements for Registration." *See id.* (emphasis added).

The protocols set forth in the Pesticide Assessment Guidelines are not required to be followed by an applicant, but are merely one accepted method of satisfying that which is required, that is, submission of particular types of data. Moreover, the Pesticide Assessment Guidelines themselves are defined by EPA as a "nonregulatory companion" to the data requirements. Thus, the Pesticide Assessment Guidelines are not regulatory in nature or in effect.[10]

In summary, FIFRA establishes an application procedure by which pesticide products are to be registered by EPA. And, EPA has promulgated regulations which set forth the types and amounts of data required to be submitted in support of an application and without which a pesticide will not be registered. The Pesticide Assessment Guidelines then provide acceptable protocols for conducting tests designed to generate the required data. But, neither EPA's registration requirements nor the Pesticide Assessment Guidelines set packaging requirements other than those for child-resistant packaging.

**b. The Registration Process Is Neither A Packaging Requirement Nor The Approval Of Packaging**

Because there exists a registration procedure and because Bio–Lab submitted data when applying for the registration of Aqua Chem, Bio–Lab argues that the fact of registration establishes the existence of EPA package regulation and the approval of its packaging by EPA. Then, to fall within the protection of *Lowe,* Bio–Lab argues that its packaging would have to be changed to avoid the State common law defective packaging claim asserted in Count II of Lucas' Complaint ("any state law claim that would require the defendant to alter its EPA-approved . . . packaging is preempted." *Lowe,* 47 F.3d at 129–30).

■ These contentions are superficially appealing because EPA obviously has established a comprehensive pesticide registration process and, in connection with it, the agency requires and reviews considerable data about the product. The application form requires the submission of some information about the packaging to be used. On the basis of the product data, EPA can require special packaging. And, that EPA did not do so when registering Aqua Chem might permit the inference that EPA has given its blessing to Aqua Chem's packaging. The argument, however, does not survive close scrutiny for several reasons.

---

**10.** As to storage stability, the Pesticide Assessment Guidelines set forth protocols for providing data relating to the product's chemical stability when stored in its proposed packaging. *See* 40 C.F.R. § 158.190. The accepted data collection method requires that the product be placed in its commercial container for one year under warehouse (or other specified) conditions. *See* Pesticide Guidelines; Mitchell Aff. ¶ 6. The registrant is then required to report on product deterioration or degradation while stored in its container, as well as any changes which interfere with the safe handling of the product. *See* Mitchell Aff. ¶ 6.

As to corrosion characteristics, data is required to be submitted in order to evaluate the interaction between the pesticide and its packaging. *See* Pesticide Guidelines, § 63–20, Ex. 1 at 8. Thus, the corrosion characteristics test enables the EPA to evaluate whether various parts of the container are capable of withstanding the corrosive characteristics of the product during storage. If the data reveal that the proposed packaging permits leakage, the EPA has discretion to reject the pesticide registration. *See* Mitchell Aff. ¶ 9.

First, at the most basic level, it is well to recall that FIFRA's preemption clause provides that a State may not "impose or continue in effect any requirements for labeling or packaging in addition to or different *from those required under this subchapter.*" 7 U.S.C. § 136v(b) (emphasis added). Thus, in order to preempt Lucas' defective packaging claim, the statutory language first compels that Bio–Lab identify requirements imposed under the subchapter, that is, statutory requirements for packaging, or packaging requirements imposed by EPA pursuant to the authority granted by FIFRA.

Undeniably, FIFRA imposes no pesticide packaging design requirements in its substantive provisions or in defining the registration process or requirements. Nor can any pesticide packaging design requirements be found in EPA's comprehensive registration requirements or in the subpart thereof specifying the product chemistry data that must be submitted to secure registration of the product.[11]

Where, as here, EPA has promulgated no packaging requirements (other than the ones respecting child-resistant packaging), the acceptance of Bio–Lab's argument (that its submission of the required data, and the ultimate registration of its product, constitute federal regulation of packaging) would require interpreting EPA's data submission requirements as a requirement respecting the design of pesticide packaging, an analytical sleight of hand which neither the text of the statute nor logic will permit.

Indeed, a requirement that data be submitted about a particular pesticide's interaction with its packaging is quite different than a requirement that that same pesticide be packaged according to particular parameters, or, that packaging be in a particular form, mode or design. In other words, the requirement on which Bio–Lab fastens its preemption argument pertains to data, rather than to the design of the packaging of the product.[12]

Thus, Bio–Lab's theory cannot be squared with the text of FIFRA's preemption clause because neither the registration requirements nor the product chemistry data requirements constitute requirements respecting packaging within the meaning of FIFRA's preemption clause. That being so, the State law defective packaging claim in Count II does not impose State packaging "requirements in addition to or different from those required under" FIFRA.

Furthermore, acceptance of Bio–Lab's argument would be tantamount to finding a packaging regulation by inference where none is mentioned explicitly. EPA clearly knows how to impose labeling and packaging requirements by promulgating regulations. In fact, it has imposed very extensive labeling requirements. But, EPA has not regulated packaging, except in a very narrow way that, as to design, imposes requirements to protect children younger than five years old. EPA has elected, however, not to impose packaging requirements for the protection of the principal users of pesticides—adults. Where EPA has so obviously chosen not to exercise its Congressionally-confirmed authority to impose packaging design requirements, it would be a remarkable exercise of federal judicial power to foreclose all State packaging design law other than that applicable to child-resistant packaging.

---

**11.** Here it is also significant that the Code of Federal Regulations, 40 C.F.R. § 157, *et. seq.,* reserves subpart A for the promulgation of an as-yet-undetermined packaging regulation. The reasonable inference to be drawn is that the EPA is considering promulgation of a regulation of packaging other than in the area of child-resistance, but has not yet chosen to do so.

**12.** Of course, if the product composition data prompts EPA to dictate some sort of special packaging requirement, it is free to do so. But, that was not done here. That undisputed fact and the absence of any EPA general packaging design requirement is persuasive evidence that not only are there no packaging requirements promulgated by regulation, but also that there was no EPA approval of any specific packaging.

The result of such a federal arrogation of State power would be to leave unprotected the overwhelming majority of pesticide users because a finding of preemption would leave no redress for defective packaging claims except that which could be found in a claim for violating the federal regulations, which do not protect anyone but children under five. With the noted exception of child-resistant packaging, the federal regulations impose no FIFRA-created duty with respect to pesticide packaging. Therefore, even though Virginia law recognizes a cause of action for breach of a federally-imposed duty, there is no regulation on which Lucas could predicate such a claim.[13]  *See Lowe,* 47 F.3d at 129–30. Recognizing as well that "[i]t is well-settled among the lower federal courts that there is no federal private right of action under the FIFRA," *Jeffers,* 84 F.Supp.2d at 779 n. 5, preemption of Lucas' defective packaging claim would leave Lucas without recourse. As the court in *Jeffers* concluded, "[s]uch a lack of recourse is contrary to the purpose of the FIFRA," see *id.,* which, with respect to FIFRA's grant of authority to the EPA regarding pesticide packaging, is to "protect children and adults from serious injury or illness resulting from accidental ingestion or contact with pesticides." 84 F.Supp.2d at 780. Recalling that " '[t]he purpose of Congress is the ultimate touchstone' of preemption analysis," see *Cipollone,* 505 U.S. at 515, 112 S.Ct. 2608, it cannot be said that the purpose of Congress was to foreclose claims such as Count II—alleging defective packaging of Bio–Lab's Aqua Chem chlorinated tablets—where, as here, (and unlike in the regulation of labeling) EPA has not promulgated regulations imposing requirements for the design of pesticide packaging.

## CONCLUSION

For the foregoing reasons, Bio–Lab's Motion to Dismiss is denied with respect to Lucas' Count II.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

**13.** Or, as the *Jeffers* court stated: "The absence of regulations results in an absence of standards on which to base such causes of action." *Jeffers,* 84 F.Supp.2d at 779 n. 5. While it remains unclear whether that court was aware of the existence of the Pesticide Guidelines submitted by Bio–Lab to this Court, the *Jeffers* court did conclude that "[t]he EPA has chosen to regulate only in the area of child resistant packaging," and that "[t]he absence of packaging and approval procedures and regulations ... dictates that

Plaintiff's packaging claims are not preempted." *Id.* at 781. Similarly, in *Lyall v. Leslie's Poolmart,* 984 F.Supp. 587, 595 (E.D.Mich. 1997), the court concluded:

the only specific area which the EPA has chosen to regulate is the area of child-resistant packaging. There simply are no other federal statutory requirements under FIFRA or under the EPA regulations which govern the design of pesticide containers. Neither the container nor its design were submitted for EPA approval.